IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LEONARDO de CARVALHO PEREIRA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:23-cv-5-ECM-JTA |
| | ) | (WO) |
| NIVA COSTA CRUZ GUNTER, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER AND REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE</u>

### I.    INTRODUCTION

Before the court is *pro se* Plaintiff Leonardo de Carvalho Pereira's Complaint and Verified Petition to Domesticate a Foreign Florida Judgment and To Order the Return of Abducted and Wrongfully Retained Children Pursuant to International Treaty and Federal Statute. (Doc. No. 1.) Also before the court are the following motions: Defendant Niva Costa Cruz Gunter's Motion to Dismiss (Doc. No. 11), which the court converted to a Motion for Summary Judgment pursuant to Rule 12(d) of the Federal Rules of Civil Procedure;[1] Pereira's Motion to Serve Supplemental Pleadings to Set Out the Occurrence of Domestication in the Federative Republic of Brazil of Judgments from the State of Florida that Ordered the Return of Wrongfully Retained Children (Doc. No. 20); and

---

[1] *See* Doc. No. 12 (April 14, 2023 Order converting the motion to dismiss to a motion for summary judgment).

Pereira's Motion to Serve Supplemental Pleadings to Set Out the Pronouncement by the Brazilian Federal court of Juiz de Fora of a Return order of Wrongfully Removed Children (Doc. No. 24). For the reasons stated below, it is the Recommendation of the Magistrate Judge that Pereira's Petition (Doc. No. 1) be DENIED and that Gunter's Motion to Dismiss and Motion for Summary Judgment (Doc. No. 11) be GRANTED. Further, for the reasons set forth below, it is ORDERED that Pereira's Motions to Supplement (Docs. No. 20, 24) be GRANTED.

## II.   JURISDICTION

This action has been referred to the undersigned "pursuant to 28 U.S.C. § 636 … for all pretrial proceedings and entry of any orders or recommendations as may be appropriate." (Doc. No. 4.)

Pereira's Complaint and Verified Petition (Doc. No. 1) arises under the International Child Abduction Remedies Act ("ICARA"), as amended, 22 U.S.C. §§ 9001-9011 (formerly 42 U.S.C. §§ 11601–11610) which establishes procedures for implementing the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No 99-

11, 1343 U.N.T.S. 89.[2] Therefore, this court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331[3] and 22 U.S.C. § 9003(a).[4]

Venue and personal jurisdiction are uncontested, and the undersigned finds sufficient grounds for both in this district and division.

### III.   STANDARD OF REVIEW

A.   Hague Petition/ICARA Petition

"The Hague Convention ensures that in almost every circumstance, a custody dispute will begin in, and remain for resolution in, the country of the child's[5] 'habitual residence.'" *Stirk v. Lopez*, No. 8:20-cv-2894-SDM-AAS, 2021 WL 1139664, at *3 (M.D. Fla. Mar. 25, 2021) (Merryday, D.J.) (citing *Baran v. Beaty*, 526 F.3d 1340, 1344 (11th Cir. 2008)). The Convention is designed "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Baran*, 526 F.3d at 1344 (quoting *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007) (quoting in turn Convention, pmbl.))." Thus, where a child has been wrongfully removed or retained, "the Convention provides the non-abducting parent with

---

[2] Both Brazil and the United States are Hague Convention signatories. *Silva v. Dos Santos*, 68 F.4th 1247, 1253 (11th Cir. 2023).

[3] 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

[4] 22 U.S.C. § 9003(a) provides that "[t]he courts of the States and United States district courts shall have concurrent original jurisdiction of actions arising under the [Hague] Convention."

[5] The Convention ceases to apply "when a child attains the age of 16 years." (Convention, art. 4.) It appears to be undisputed that, at present, the children at issue in this case are under the age of 16 years.

a remedy of return, intended to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings." *Id*.; *see also De Carvalho v. Carvalho Pereira*, 308 So. 3d 1078, 1081 (Fla. Dist. Ct. App. 2020) ("'[T]he Convention seeks to deter parental abductions by eliminating the primary motivation for abductions, which is to obtain an advantage in custody proceedings by commencing them in another country.'" (quoting *Strout v. Campbell*, 864 So. 2d 1275, 1277 (Fla. 5th DCA 2004) (citing in turn *Holder v. Holder*, 305 F.3d 854, 860 (9th Cir. 2002))).

To these ends, "the Hague Convention, as implemented by ICARA, 'ordinarily requires the prompt return of a child wrongfully removed or restrained away from the country in which she habitually resides.'" *Sain on behalf of V.R.S. v. Sain,* 548 F. Supp. 3d 1181, 1188–89 (M.D. Fla. 2021) (quoting *Monasky v. Taglieri*, —— U.S. ——, 140 S. Ct. 719, 723 (2020) (citing in turn Convention, art. 12))). Further, "[b]ecause return is merely 'a "provisional" remedy that fixes the forum for custody proceedings,' *Monasky*, 589 U. S. at ——, 140 S. Ct. at 723, the Convention requires that the determination as to whether to order return should be made 'us[ing] the most expeditious procedures available,' [Convention, art. 7]." *Golan v. Saada*, 596 U.S. 666, 671 (2022).

"Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence" a *prima facie* case "that the child was wrongfully removed or retained" from the child's place of habitual residence. *Golan*, 596 U.S. at 672-73.

4

Although neither the Hague Convention nor ICARA defines the term "habitual residence," the term's plain meaning at the time of the treaty's enactment was well-settled. *See Monasky*, 140 S. Ct. at 726. "A child 'resides' where she lives," *id*. (citing *Residence, Black's Law Dictionary* (5th ed. 1979)), and a "habitual" residence implies one that is "customary, usual, [or] of the nature of a habit," *id*. (quoting *Habitual, Black's Law Dictionary* (5th ed. 1979)); *see also id*. at 732 (Thomas, J., concurring in part and concurring in the judgment) (citing dictionary definitions from the 1970s and 1980s to define "habitual" as "customary" or "usual" and "residence" as referring "to a personal presence at some place of abode, one's usual dwelling-place, or the act or fact of abiding or dwelling in a place for some time" (internal citations, alterations, and quotation marks omitted)). "[A] child's habitual residence depends on the particular circumstances of each case," not an actual agreement between a child's parents. *Id.* (majority opinion) at 726–27. Indeed, "locating a child's home is a fact-driven inquiry," which requires courts to be "sensitive to the unique circumstances of the case and informed by common sense." *Id*. at 727 (quotation omitted).

"For older children capable of acclimating to their surroundings, courts have long recognized [that] facts indicating acclimatization will be highly relevant" in determining habitual residence. *Id*. For example, acclimatization might be shown through the child's "academic activities," "social engagements," "immigration status of child and parent," and "location of personal belongings." *Id*. at 727 n.3. And for other children, "especially those too young or otherwise unable to acclimate, [who] depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations." *Id*. at 727. No single fact is dispositive across all cases. *Id*. "Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id*.

*Sain*, 548 F. Supp. 3d at 1189.

In addition to proving that the child was a habitual resident of the country to which the petitioner seeks return, the petitioner's *prima facie* case requires the petitioner also to establish that the removal or retention of the child away from the country of habitual residence was "wrongful." 22 U.S.C. § 9003(e)(1) (providing that the petitioner "shall

establish by a preponderance of the evidence … that the child has been wrongfully removed or retained").

A removal or retention is "wrongful" if it meets the following two criteria:

a) it is in breach of rights of custody attributed to a person, ... either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020) (quoting Convention, art. 3.)

"Rights of custody," for purposes of the Hague Convention, are "rights relating to the care and person of the child and, in particular, the right to determine the child's place of residence." (Convention, art. 3.) These custody rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the state." (Convention, art. 3.) Further, "[i]n ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3," the court "may take notice directly of the law of, and of judicial or administrative decisions, formally recogni[z]ed or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Convention, art. 14.

A *prima facie* case of wrongful removal, even if established, does not necessarily end the inquiry. "If the court finds the child was wrongfully removed or retained, the

respondent opposing return of the child has the burden of establishing that an exception to the return requirement applies. § 9003(e)(2)." *Golan*, 596 U.S. at 671-72. ICARA applies different burdens of proof depending on the exception at issue. 22 U.S.C. § 9003(e)(2).

The following exceptions may be established by the respondent by a preponderance of the evidence:

- Delay. More than one year has passed since the wrongful removal or retention occurred, and the child has become settled in the child's new environment.

- Consent or Acquiescence. The person seeking return consented or acquiesced to the child's removal or retention.

- Nonexercise of Custody Rights. The party seeking return was not exercising rights of custody at the time of the wrongful removal or retention.

- Objection of the Child. The child objects to return, where the child has attained a sufficient degree of age and maturity that it is appropriate to take the child's views into account.

*The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges*, Third Edition, page 99, 2023 WL 5751421; *see also* Convention, arts. 12, 13; 22 U.S.C. § 9003(e)(2).

In addition, the respondent may establish the following exceptions by clear and convincing evidence:

- Grave risk: "[T]here is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

- Human Rights: Return of the child "would not be permitted by the fundamental principles of the requested State related to the protection of human rights and fundamental freedoms."

Convention, arts. 13b, 20; *see also The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges*, Third Edition, page 100, 2023 WL 5751421; 22 U.S.C. § 9003(e)(2).

"Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be 'promptly returned' to the child's country of habitual residence. § 9001(a)(4)." *Golan*, 596 U.S. at 672.

B.    Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Palm v. United States*, 904 F. Supp. 1312, 1314 (M.D. Ala. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-324. A factual

dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255.

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e). As stated in *Celotex*, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322.

## IV.    FINDINGS OF FACT[6]

A.    Facts of the Case

---

[6] Except where otherwise noted, these facts and procedural history are undisputed in the sense that no contrary evidence has been submitted. For purposes of analyzing Gunter's summary judgment motion, the undersigned relies only on the undisputed facts.

Pereira resides in Juiz de Fora, State of Minas Gerais, Brazil. (Doc. No. 1 at 1.) Gunter currently resides with the parties' two children, a daughter and a son, in California, along with her husband, Troyce Ray Gunter.[7] (Doc. No. 36-2 at 2-3; Doc. No. 44 at 2.) At the time Pereira filed this action in 2023, Gunter lived with the children in Andalusia, Alabama. Gunter has been a legal permanent resident of the United States since 2018. (Doc. No. 1-7 at 2.)

Pereira and Gunter married on October 15, 2010. (Doc. No. 1 at 5.) They lived together in Juiz de Fora, State of Minas Gerais, Brazil, from 2011-2016. (*Id*.) In 2016, Pereira and Gunter traveled to Florida with their daughter.[8] (*Id*.) When the parties traveled to Florida, Gunter was pregnant with the parties' son. (*Id*.) She subsequently gave birth to him in Florida[9] in March 2016. (*Id*.) Prior to 2020, the daughter became a permanent legal resident of the United States. (Doc. No. 1-8 at 22.)

The purpose of the parties' relocation to Florida was for Pereira, an established cardiologist in Brazil, to obtain a medical residency and additional medical certifications, and for the parties to stay in the United States during the medical residency.[10] (*Id*. at 6.)

---

[7] To distinguish him from the Defendant in this case, Troyce Ray Gunter will be referred to in this Order and Recommendation by his full name, and Defendant will be referred to as "Gunter."

[8] The parties also traveled with A.C., Gunter's minor child by a previous relationship. (Doc. No. 1-7 at 2.)

[9] The son is an American citizen. (Doc. No. 1 at 5.)

[10] The parties dispute whether their shared intent was ever to reside in the United States permanently, but it is undisputed that, when they arrived in the United States, they did at least mutually intend to reside in the United States with the children during the period of Pereira's medical residency, which Pereira at one point stated he expected to last one or two years. (Doc. No. 1 at 6; Doc. No. 18-7 at 7.)

They also intended for the parties' son to be born in the United States and, thus, acquire citizenship. (*See* Doc. No. 1-10 at 5.) Gunter's family also traveled to the United States with the parties with the intent of starting a business in the United States.

When Pereira's plan to obtain a particular medical residency failed, the parties differed on whether they would return immediately to Brazil. Pereira decided to return to Brazil and did so in March 2016 shortly after Gunter gave birth to the parties' son. (Doc. No. 1-8 at 22.) Gunter remained behind in Florida with the children. (Doc. No. 1 at 6.)

Not later than April 5, 2016,[11] Gunter informed Pereira that she intended to end the marriage and to remain in the United States with the children. (*Id.*) Pereira disagreed with Gunter's desire for the children to remain in the United States. (*Id.*; Doc. No. 1-8 at 7.)

---

[11] In prior cases, the parties have disputed whether, prior to April 2016 and before Pereira left for Brazil, Gunter informed Pereira of her intent to remain in the United States and to get a divorce. They have also previously disputed whether Gunter ever agreed with Pereira to return to Brazil with the children. Pereira argued to the court in Florida and asserted in his Complaint and Verified Petition in this court (Doc. No. 1 at 6) that Gunter initially agreed with him to move, then later, in April 2016 after his return to Brazil, Gunter first notified him by email that she would remain in Florida.

According to an appellate court in Brazil, Pereira made a statement to the Brazilian Federal Administrative Central Authority that, in mid-February 2016, he told Gunter that he intended to move back to Brazil, and she initially "showed great reluctance in accepting it, although she did agree." (Doc. No. 18-7 at 8.)   However, according to Pereira's statement, "the next day in the afternoon," Gunter told Pereira she would not move back to Brazil and that, if he chose to move to Brazil, she would divorce him and stay in Florida with the children. (*Id.* at 8-9; Doc. No. 1-4 at 96-97.) According to Pereira, he and Gunter then argued, after which Gunter agreed to move back to Brazil with the children, going so far as to inquire with a school in Brazil about re-enrolling A.C., her older son (who is not a subject of Pereira's Hague petition). (Doc. No. 1-4 at 96-97; Doc. No. 1-5 at 22-25.)

Gunter, for her part, contended that she did not truly change her mind back to agreeing to move to Brazil, but allowed Pereira to think so to mollify his anger after the parties argued because she was pregnant and because Pereira lost emotional control and made verbal and physical threats to her and the children. (Doc. No. 18-7 at 9.) According to Gunter, Pereira even bought a machete to threaten her and kicked Gunter's older son, A.C., in the back in anger. (*Id.*)

In July 2016, Gunter filed for divorce in Brazil. (Doc. No. 1 at 6.)

On August 2, 2016, Pereira filed a petition with the government of Brazil to seek assistance under the Hague Convention for returning his children to Brazil. (Doc. No. 1-7 at 3.) At some point, the Brazilian Central Authority denied his petition after concluding that Gunter did not wrongfully retain the children in the United States in 2016 in violation of the Hague Convention, but rather Pereira had unilaterally moved to Brazil after he and Gunter originally agreed that the children would be domiciled in Florida during his medical residency. (Doc. No. 18-7 at 4, 10.)

On June 14, 2017, Pereira filed an action in the Circuit Court for the Ninth Judicial District of Florida in and for Orange County, Florida, Case No. 2017-DR-8793-O, seeking domestication of a foreign judgment and return of the children under the Hague Convention. (Doc. No. 1-7 at 3; Doc. No. 1-8 at 20; Doc. No. 1-10 at 6; Doc. No. 1-10 at 6.) That petition was denied on June 28, 2017. (Doc. No. 1-8 at 20.)

On July 14, 2017, the Judicial Branch of the State of Minas Gerais in Brazil issued a divorce decree. (Doc. No. 1-7 at 3.) The court did not enter a final custody determination because it found that the United States was the children's permanent place of residence, and, therefore, under the Hague Convention, the appropriate jurisdiction for custody determination. (Doc. No. 48-3 at 22.) The State Supreme Court of Minas Gerais later

---

It is not necessary or proper for purposes of this litigation to reassess if or when Gunter ever agreed to move back to Brazil in 2016. This dispute need not be addressed by this court, as it is relevant to whether Gunter wrongfully retained the children in Florida when she refused to move with them to Brazil in 2016, but not to whether Gunter wrongfully removed the children from Brazil in January 2022.

described the divorce decree as "establishing, in relation to the institute of custody and visitation, that the Brazilian judicial authority would be incompetent to prosecute and judge the claim, considering that the children lived in the USA." (Doc. No. 19-2 at 33-34 (February 14, 2023 opinion of the State Supreme Court of Minas Gerais recounting the procedural history of the litigation); Doc. No. 48-3 at 22 (same, in an August 11, 2023 opinion by the State Supreme Court)). The State Supreme Court further observed that "[t]his decision was confirmed" on subsequent appeals, including by the State Supreme Court itself and by Brazil's Supreme Court of Justice. (Doc. No. 19-2; Doc. No. 48-3 at 22.)

On July 19, 2017, Gunter married Troyce Ray Gunter in Duval County, Florida.[12] (Doc. No. 1- 7 at 2.) The record indicates Troyce Ray Gunter is a member of the Federal Senior Executive Service and more recently that Troyce Ray Gunter is employed by the United States military. (*Id.*; Doc. No. 31 at 2.)

On October 25, 2017,[13] Pereira filed an amended verified Hague Convention petition in the Fourth Judicial Circuit in and for Duval County, Florida, Case No. 10-2019-DR-759-FMXX, arguing that the children's place of habitual residence was Brazil and requesting return of the children to Brazil for a custody determination there. (*Id.* at 7; Doc. No. 1 at 6; Doc. No. 1-8 at 4, 20 (Fourth Judicial Circuit's order granting the petition).)

---

[12] Pereira has also since remarried. On October 8, 2021, Pereira married a Brazilian citizen, Dr. Debora Gaburri. (Doc. No. 1 at 5; Doc. No. 1-14.)

[13] The Fourth Judicial Circuit's opinion suggests two dates for Pereira's refiled verified petition: October 25, 2017 and November 4, 2019. (Doc. No. 1-8 at 4, 20.)

Neither Pereira nor Gunter submitted for domestication any final order of a Brazilian court determining custody or access rights, such as visitation. (Doc. No. 1-7 at 3; Doc. No. 1-10 at 6.)

On December 7, 2017, the State Supreme Court of Minas Gerais, Brazil, issued an opinion in which it held that, "concerning the institute of custody of the minors," "the Brazilian justice system" lacked jurisdiction "to adjudicate on the matter regarding custody."[14] (Doc. No. 48-3 at 26.)

In March 2019, due to Gunter's relocation with Troyce Ray Gunter and the children, the Florida proceedings were transferred to the Fourth Judicial Circuit in Clay County, Florida. (Doc. No. 1-10 at 6-7.)

On January 6, 2020, the Fourth Judicial Circuit Court found that Gunter wrongfully retained the children from Brazil, their country of habitual residence, in March 2016 when she refused to return the children to Brazil.[15] (Doc. No. 1-8 at 4-25.) The Florida Circuit Court "conclude[d] that, in accordance with the provisions of the Hague Convention, [the parties' daughter and son] must be returned to Brazil to allow their country of habitual residence to resolve the ongoing custody dispute between the parties." (*Id.* at 24.) The court then ordered Gunter to return the children to Brazil for that purpose. (*Id.* at 25.)

---

[14] The December 7, 2017 decision of the State Supreme Court is not in the record. The quotations here are taken from the August 11, 2022 decision of the State Supreme Court, in which it described its own December 7, 2017 holding. (Doc. No. 48-3 at 26.)

[15] At the final hearing before the Florida trial court, Pereira appeared in person with counsel and Gunter appeared *pro se* by videoconference. (Doc. No. 1-8 at 4; Doc. No. 1-9 at 5 n.1.)

On February 13, 2020, the Florida Circuit Court denied rehearing of its order requiring Gunter to return the children to Brazil. (Doc. No. 1-9 at 8.) In so ruling, the Florida Circuit Court stated that it was not bound by the Brazilian courts' prior determination that Brazil had no jurisdiction to rule on the custody issue and that the Hague Convention required custody determination in the United States. (Doc. No. 1-9 at 6 (addressing "the Former Wife's argument … that pursuant to two Brazilian Appellate Court Opinions … , the Former Husband's verified petition for return of the parties' [c]hildren is not properly before the Court because the issue of jurisdiction was previously addressed and decided by courts in Brazil," and rejecting Gunter's argument on grounds that "the Brazilian Appellate Court Opinions, and any underlying Orders of the Brazilian Courts, are not binding on this Court as it pertains to the Hague Convention for a variety of reasons, and do not constitute the principle of *res judicata*").)

In the February 13, 2020 Order, the Florida Circuit Court further issued a new order that the children be returned to "the jurisdiction of the family court, Third Family Law Sector of the District of Juiz de Fora… *subject to the independent determination by the Brazil courts of all issues related to the custody of the children*," and, to that end, it "cancel[led] and supersed[ed]" the portion of the January 6, 2020 Order that directed Gunter to transfer custody of the children to Pereira for their return to Brazil. (Doc. No. 1-9 at 8-9 ¶¶ 4, 6 (emphasis added).) Instead, the Florida Circuit Court supplanted the previous orders to return by giving Gunter the option of either turning custody of the children over to Pereira for their return to Brazil or, alternatively, "personally accompany[ing] the [c]hildren on their return to Brazil at her sole expense *and there*

15

*maintain[ing] custody of the [c]hildren pending further orders of the Brazilian court.*" (*Id.* at 9 ¶ 7 (emphasis added).) Gunter appealed.

In May 2020, Gunter and Troyce Ray Gunter moved with the children to Andalusia, Alabama. (Doc. No. 1 at 7.)

On November 16, 2020, the First District Court of Appeal for the State of Florida affirmed the Florida Circuit Court's decision, holding that the Florida Circuit Court's finding that Brazil was the children's habitual residence at the time of retention was not clear error, despite "the possibility that [the appellate court] might have gone the other way had it been [their] call" and that "another court might have weighed the facts and determined the credibility of the witnesses differently." (Doc. No. 1-10 at 9-10.)[16] The Florida appellate court further emphasized that its decision "was not a determination of the ultimate custody, parental responsibility, or time-sharing between the parents," but only "fixe[d] the forum for custody proceedings" in Brazil. (*Id.* at 10.)

In January 2021, after the disposition of the appeal, the Fourth Judicial Circuit Court entered an Order directing Gunter to return to Brazil with the children. (Doc. No. 1-10 at 14-17.)

On February 10, 2021, as Gunter was in the process of returning to Brazil but had not yet arrived there, Pereira filed an action in the Juvenile Court in Juiz de Fora requesting the seizure of the minor children's passports and judicial notice to the Federal Police of

---

[16] The November 16, 2020 Opinion of the Florida District Court of Appeal, First District, is in the record at Doc. No. 1-10 and is also available at *De Carvalho v. Carvalho Pereira*, 308 So. 3d 1078, 1081 (Fla. Dist. Ct. App. 2020).

Brazil that the minor children were not allowed to leave Brazil once they arrived. (Doc. No. 1 at 8.)   Among the grounds he urged for the injunctive relief he sought, Pereira represented to the Juvenile Court in Brazil that Gunter had "committed international abduction of minors" when she "took [Pereira's] children to the United States without [Pereira's authorization]"[17] and kept Pereira "from having any contact with the children for almost five (5) years."[18] (Doc. No. 18-3 at 4.) Pereira's representations were later determined by the juvenile court to be false.[19]

On February 19, 2021, the Juvenile Court of the Judicial District of Juiz de Fora preliminarily granted Pereira's petition[20] and commanded Gunter to turn over the children's passports to the court. (*Id.*; Doc. No. 18-3.) The February 19, 2021 Order further

---

[17] This is false. It is undisputed that Gunter did not "take" the children to Florida without Pereira's consent, but that Gunter and Pereira both took them there together with a mutual plan to remain there until Pereira completed a medical residency. Thereafter, there arose a dispute about whether Gunter wrongfully *retained* the children there in violation of the Hague Convention. Also, there is no evidence that Gunter has been charged with or convicted of abduction or kidnapping.

[18] This is false. The Florida court documents Pereira submitted in support of his Complaint and Verified Petition reflect that Gunter did *not* prevent Pereira from "having any contact" with his children over the previous five years. (*See, e.g.*, Doc. No. 1-6 (temporary time sharing order); Doc. No. 1-8 at 5 (Florida Circuit Court's January 6, 2022 Order granting Pereira's Hague petition, stating, "the court recognizes [Pereira] has had very little in-person contact with the children over the past three years. However, as provided for by Court Order, [Pereira] has had regular and frequent video-conference contact with the children.")). Further, the lack of in-person contact occurred while the children and Pereira resided in different countries.

[19] After the Juvenile Court had an opportunity to receive evidence from all parties and enter a final decision, it found Pereira guilty of vexatious proceedings and fined him because of false representations in pursuing his petition; that decision was upheld on appeal. (Doc. No. 19-2 at 40; Doc. No. 48-3.)

[20] It does not appear that Gunter had an opportunity to appear and be heard prior to entry of the February 19, 2021 Order.

preliminarily established joint custody[21] with both parents, in view of Brazilian policy favoring joint custody except where joint custody is demonstrated not to be in the children's best interests. (Doc. No. 18-3.) Yet, the court clarified that its provisional joint custody determination was as to the "shared decisions on the various aspects involving [the childrens'] lives, including their education, leisure, and social commitments." (*Id.*) The court concluded that the children were to *reside* with Gunter, and Pereira's visitation rights and parenting time were to be resolved after completion of a psychosocial study of the children. (*Id.*)

---

[21] Pereira's description of the procedural history is misleading. In his Verified Petition, Pereira states:

> A petition for dissolution of marriage was filed by the Respondent in Brazil's family court in July 2016 and a divorce decree was made on 07/12/2017. The merits of custody of minor children were prolonged and a provisional measure of joint custody was granted on 02/19/2021, despite Respondent's recalcitrance. A certified copy and certified translation of the Brazilian order is attached to this petition as Exhibit "C."

(Doc. No. 1 at 6 ¶ 27.)

Exhibit C (which does not include a certified translation) is the *ex parte* February 29, 2021 Preliminary Order of the Juvenile Court of Juiz de Fora temporarily establishing joint custody, which that court itself revoked on December 17, 2021, in an order that was later affirmed on February 14, 2023, by the State Supreme Court of Minas Gerais. (Doc. No. 1-3; Doc. No. 18-3; Doc. No. 18-4; Doc. No. 19-2; *see also* Doc. No. 48-3.) Although a supersedeas to the appeal entered on January 11, 2022, purported to stay the effect of the trial court's order revoking the February 19, 2021 order, the supersedeas itself was reversed by the State Supreme Court on August 11, 2022, well before Pereira filed his Complaint and Verified Petition in this court. (Doc. No. 18-9; Doc. No. 48-3.) Pereira similarly relied on the supersedeas in his Complaint and Verified Petition without clearly divulging that it had been reversed prior to the filing of his petition. (Doc. No. 1 at 8 ¶¶ 53-54.)

The undersigned finds that Pereira violated Rule 11 of the Federal Rules of Civil Procedure by inviting the court to rely on Brazilian court orders without clearly informing the court that those orders had subsequently been revoked or reversed.

On February 22, 2021, Gunter arrived in Brazil with the children for resolution of the custody issue, in accordance with the Florida court's orders. (Doc. No. 1 at 8.) She surrendered the children's passports to the Juvenile Court in accordance with the Juvenile Court's February 19, 2021 Preliminary Order. (*Id.*)

On March 23, 2021, the Superior Court of Justice in Brazil denied Pereira's special appeal of a prior interlocutory decision in the divorce case[22] by the Court of Appeals of the State of Minas Gerais. In the decision from which Pereira appealed, the Minas Gerais Court of Appeals had held that (1) there had been no proof of illegal retention by Gunter of the children in the United States in violation of the Hague Convention; (2) Brazilian courts had no jurisdiction to determine custody and that, "considering the couple's – and therefore the children's – residence was proven to be established in the USA since 2016, it is up to the Justice of the USA to consider the custody relief that is being sought;"[23] and (3) Pereira's

---

[22] It appears that the decision of the Court of Appeals that was at issue in the Superior Court of Justice's March 23, 2021 opinion was related to the divorce action, as that decision also involved distribution of property (a Dodge Journey automobile) that was at issue in the divorce case, and as the Superior Court of Justice characterized its opinion as being issued in a "contested divorce" and child custody case. (Doc. No. 18-7.) According to the Superior Court, the Court of Appeals had affirmed the trial court's divorce decree, including the trial court's decision that Gunter did not violate the Hague Convention. (*Id.* at 5.) In a separate opinion issued in February 2023 in a related action, the State Supreme Court acknowledged that not only it, but the Superior Court of Justice, had affirmed the divorce decree, including the finding that Brazil's courts lacked jurisdiction to determine custody, and that such jurisdiction instead lay in the United States. (Doc. No. 19-2 at 36-37.)

[23] The Court of Appeals had reviewed the evidence and concluded that Pereira and Gunter together intended to move domicile to the United States with the children for a period of time so that he could pursue a medical fellowship, and that Pereira thereafter unilaterally decided to move the family to Brazil. The Court of Appeals went on to conclude:

Thus, based on the evidentiary elements attached to the case, combined with Appellee's statements, we can see that the decision to move to Brazil, different from the decision to move to the USA, *was taken unilaterally by [Pereira], in violation of Federal Constitution, Art. 226 § 5 and the Child and Adolescent Statute*

"intent to distribute a vehicle that is in the name of a person not involved" in the divorce dispute was "unreasonable, notably under penalty of violating the rights of third parties." (Doc. No. 18-7 at 2-3 (summarizing the opinion of the Court of Appeals).) Pereira argued that the Court of Appeals erred because (1) under the Hague Convention, Brazil was the children's place of habitual residence and therefore Brazil's courts did have jurisdiction to determine custody; (2) where custody determinations involved the Hague convention, jurisdiction to determine custody lay in Brazil's state courts, not its federal courts; and (3) though title to the automobile was in his brother-in-law's name, it was marital property subject to distribution because he bought it with his own money. (*Id*. at 3-4.) The Superior

---

*(ECA) Art. 21*, where marriage rights and duties, including parental power, are equally exerted by the husband and the wife.

In view of the foregoing, the illegal retention of the couple's children in the USA was not demonstrated to warrant the application of the [Hague Convention], but, on the contrary, what seems to have occurred was [Pereira's] abandonment of the family where he, in mutual agreement with his ex-wife, had decided to settle as the usual residence together with the couple's children.

The same conclusion was drawn by the Federal Administrative Central Authority of the Special Department of Human Rights, which, when reviewing the story of the facts told by [Pereira], decided that "the situation as described below, prima facie and to the best of their knowledge, is not adequate to the requirements of the Hague Convention.

Thus, with no circumstances demonstrated to draw the applicability of the [Hague Convention], the internal legislation must be resorted to in order to determine the jurisdiction for the motion for custody…

….

In the case in question, no events in Articles 21-23 of the Brazilian Civil Procedure Code 2015 were acknowledged to draw the jurisdiction of the Brazilian judicial authority, and further considering that the couple's – and therefore the children's – residence was proven to be established in the USA since 2016, it is up to the Justice of the USA to consider the custody relief that is being sought.

(Doc. No. 18-7 at 10 (emphasis added).)

Court of Justice denied Pereira's special appeal on several grounds, including that Pereira relied on new evidence not before the court below (*i.e.*, Florida court orders and judgments), did not demonstrate a divergence of precedent to justify a resolution by the Superior Court of Justice, and cited distinguishable precedent. (*Id.* at 11.)

On December 17, 2021, after review of the case, the Juvenile Court ultimately denied Pereira's petition and returned the children's passports to Gunter, clearly indicating that Gunter was free to return to the United States with the children. (Doc. No. 19-1; Doc. No. 48-3 at 18.) [24] The December 17, 2021 Order concluded as follows:

> *CASE DISMISSED with prejudice, regarding the custody and inversion of the referential home requests, under the terms of article 485, item V, of the Code of Civil Procedures;*
>
> *PETITION DENIED regarding the requests for seizure of the passports of the minors L.C.C.C.C. and L.C.C.C.F. and regarding the prohibition of their*

---

[24] Neither party submitted a complete copy of the Juvenile Court's December 17, 2021 Order. The excerpts of the December 17, 2021 order of the Juvenile Court are taken from the State Supreme Court's February 14, 2023 opinion, which contains large block quotations of the Juvenile Court's order (Doc. No. 19-2 at 26-27, 34-35, 39, 42-44; *see also* Doc. No. 49-1 at 7), and which the court finds to be a credible source regarding the contents of the Juvenile Court's December 17, 2021 Order. More portions of the Juvenile Court's December 17, 2021 decision, particularly the rationale, can be found quoted in italics at Doc. No. 18-7 at 5-10, which is the decision of the Superior Court of Justice (apparently an intermediate appellate court), which, in turn, denied Pereira's appeal of the December 17, 2021 Order. (Doc. No. 18-7.)

Pereira at one point argued that the copy of the State Supreme Court's February 14, 2023 decision that Gunter submitted as Doc. No. 11-1 was not properly authenticated, nor was its translation. In response, Gunter subsequently submitted an authenticated copy and certified translation of that order. (Docs. No. 19-1 and 19-2.) The undersigned relies on the authenticated copy and certified translation. (Docs. No. 19-1 and 19-2.) However, under ICARA, the Hague Convention, and the Federal Rules of Civil Procedure, a court is authorized to admit or take judicial notice of evidence of foreign law without requiring proper authentication. Convention, art. 14; 22 U.S.C. § 9005; Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law."); *Seaman v. Peterson*, 762 F. Supp. 2d 1363, 1379 n.16 (M.D. Ga. 2011), *aff'd*, 766 F.3d 1252 (11th Cir. 2014).

*leaving Brazil*, as well as their attendance in person or remotely at a Brazilian school, resolving the case on its merits, in accordance with article 487, item I, of the Code of Civil Procedures;

PETITION AFFIRMED regarding the regulation of paternal visitation, resolving the case on its merits, according to article 487, item I, of the Code of Civil Procedures, in the following terms: a) while the minors remain living in Brazil, the father will exercise his right of visitation on alternate weekends, picking them up at the mother's home on Fridays, at 7 pm, and returning them on Mondays, at 9 am, starting the visitation on the first weekend following the publishing of this decision that does not interfere with the author's professional commitments; b) in the event of the minors' return to the United States, the father may exercise his visitation rights every two months, being able to stay one week with the children, or in a manner freely agreed upon between the parties, both abroad and in Brazil, as long as they respect the routine activities of the children and pay attention to their best interests. Video calls between the father and his children are allowed, for long distance contact, when they are not performing school activities.

**I hereby convict [Pereira] for vexatious proceedings**,[25] charging him with a fine corresponding to 9% of costs of the lawsuit, pursuant to article 81 of the Code of Civil Procedures, without prejudice to any compensation for the defendant's losses. On the other hand, I reject the request to impose a penalty for vexatious proceedings on [Gunter], since I did not identify any procedural misconduct on [her] part.

I dismiss the request for the minors to spend the year-end festivities in their father's company.

*All decisions that conflict with this verdict are hereby revoked.*

---

[25] The bold emphasis is as in the original. In an appeal from the Juvenile Court's December 17, 2021 Order, the State Supreme Court later explained that "the judge convicted [Pereira] for vexatious proceedings, on grounds that he had distorted the truth of the facts." (Doc. No. 19-2 at 40.) The details and extent of Pereira's misrepresentations are not in the record. Nonetheless, the State Supreme Court found "the [Juvenile Court] Judge decided correctly, as [Pereira] presents facts that do not match reality, such as the permanence of the children in American territory without his permission, distorting the truth, because it appears from the records that it was the father who decided to return to Brazil, leaving the family on U.S. soil." (*Id.*) Further, the State Supreme Court found that Pereira falsely accused Gunter of "carr[ying] out the international abduction of the children." (*Id.*)

> *I determine the immediate return of the passports deposited in the Court Office to [Gunter].*
>
> *An official letter is to be sent to the Federal Police, forwarding a copy of this decision, requesting that it remove from its systems any prohibition against [Gunter] leaving Brazil with her minor children.*
>
> Expenses to be paid by [Pereira], since [Gunter] did not offer resistance to the visitation regulation, which, by the way, she partially proposed.
>
> I grant [Gunter] the benefit of free justice[26] ( ... )

(Doc. No. 19-2 at 26-27 (italicized emphasis added; bold emphasis in original); *see also* Doc. No. 19-2 at 35-35 (State Supreme Court's discussion of the Juvenile Court's decision); Doc. No. 1-16 at 6 (appellate court order summarizing the judgment of the Juvenile Court, noting, among other things, that the Juvenile Court dismissed the request for a custody determination and "sentenced [Pereira] to pay a malicious prosecution fine at 9% … over the adjusted amount in dispute"); Doc. No. 48-3 at 22-23 (State Supreme Court of Minas Gerais opinion summarizing and discussing the Juvenile Court's decision).)

In its December 17, 2021 ruling denying Pereira's petition and freeing Gunter to return to the United States with the children, the Juvenile Court expressly considered Pereira's argument that he had filed yet another action in Brazil seeking domestication of the Florida judgment, which was then "in progress before the Superior Court of Justice." (Doc. No. 19-2 at 44 (concurring opinion of Judge Teresa Cristina Da Cunha Peixoto) (quoting the Juvenile Court's December 17, 2021 order at length).) The Juvenile court

---

[26] Thus, it appears that Gunter was provided legal counsel in the action at no cost to her on the basis of demonstrated economic hardship.

determined, however, that *even if Brazil's courts "ratifie[d] the decisions handed down by the American [i.e., Florida state] courts," yet still (1) the Florida court did not "convict" Gunter of kidnapping or determine custody; and (2) though the custody issues would then be "open to discussion" "in the proper court," Pereira still would not be entitled to an injunction in the action before the Juvenile Court prohibiting Gunter from returning with the children to the United States*. (*Id*.)

Pereira then sought what appears to have been an *ex parte* order from the Court of Appeals staying the effect of the Juvenile Court's December 17, 2021 decision pending appeal. Pereira argued that he faced the potential risk of irremediable harm if Gunter left the country with the children. (Doc. No. 1-16 at 6-9; Doc. No. 18-9.) As further grounds for his contention that he faced risk of harm if the supersedeas was not granted, Pereira again argued, among other things, that "[Gunter] was convicted of international minor kidnapping[27] in the United States of America, illegal retention, added to the fact that the [Juvenile Court's] order favors [Gunter] leaving Brazil, in opposition to the Hague convention." (Doc. No. 18-9 at 1-2; *see also* Doc. No. 1-16 at 6-9.) Pereira also argued that the results of the psychosocial study of the children showed that any change in the children's residence should be gradual and that there was "no circumstantial evidence that

---

[27] This was a misrepresentation, not a translation error. Gunter later argued that the supersedeas was wrongly entered and should be revoked because, *inter alia*, she had not, in fact, been convicted of international minor kidnapping in the United States. (Doc. No. 18-5 at 21.) The Juvenile Court had previously convicted Pereira of vexatious litigation, in part for what appears to have been a similar false representation, a ruling that was later upheld on appeal. (Doc. No. 19-20 at 39-41.)

the children have suffered any psychological stress by returning to their country."[28] (Doc. No. 18-9 at 3.) Pereira further "argue[d] that [Gunter was at the time] being investigated by Federal Police for misrepresentation on a public or private document and use of forged documents." (Doc. No. 18-9 at 3.)

On January 10, 2022, Gunter "went to the Secretary of the 3rd Family Jurisdictional Unit of the Judicial District of Juiz de Fora … where the children's passports were handed over to her, along with the information that the travel restriction notice had already been removed by the Federal Police." (Doc. No. 48-3 at 18.)  According to Pereira, "[f]rom mid-December through mid-January, Brazilian courts and their respective law clerks are in holiday recess," which prevented Gunter "from collecting the minor children's passports until" January 10, 2022. (Doc. No. 1 at 8 ¶ 53.)

On January 11, 2022, Judge Luis Carlos Gambogi of the Court of Appeals of the State of Minas Gerais granted the supersedeas and suspended the effects of the Juvenile

---

[28] Pereira falsely represented the results of the psychosocial study. The psychosocial study indicated that abruptly moving the children *to Brazil* caused the children psychological problems. (Doc. No. 11-1 at 13-14.) In reversing the supersedeas, the State Supreme Court noted the psychosocial study's conclusions that, because of the move to Brazil, one child suffered from symptoms of separation anxiety disorder that were compromising quality of life and the other child suffered persistent psychological suffering that was compromising quality of life and required maintenance of ongoing psychological follow-up. (Doc. No. 48-3 at 28.) The State Supreme Court concluded from the record: "it is evident that keeping the children in Brazilian territory is causing them significant distress." (*Id.*) These discrepancies between Pereira's representations to the court and the evidence that lay before the court are noted simply for clarification and to further illustrate Pereira's pattern of misstating facts and evidence in judicial proceedings. The undersigned has not considered the children's best interests in recommending a ruling on Pereira's Complaint and Verified Petition or on any pending motion before the court. *Hazbun Escaf v. Rodriquez*, 191 F. Supp. 2d 685, 689 n.16 (E.D. Va.), *aff'd sub nom. Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir. 2002) ("Although some of the defenses to the return of a child under the Hague Convention raise issues that may mirror those in a custody dispute … the purpose of the Hague Convention proceeding is not to determine the best interests of the child, as is true in a custody dispute.").

Court's December 17, 2021 Order "until such appeal is duly judged by the Judging Panel, especially in consideration of the best interest of the minors." (Doc. No. 18-9 at 4.) In reaching his decision, Judge Gamboi relied on Pereira's representations (and misrepresentations) to conclude that Pereira had demonstrated a substantial risk of harm to himself and the children if the Juvenile Court's order were not stayed. (Doc. No. 18-9 at 2-4.) It does not appear that Gunter had an opportunity to appear and be heard through counsel or otherwise prior to Judge Gambogi's ruling on Pereira's motion. The apparent intended effect of the supersedeas was to stay the Juvenile Court's December 17, 2021 Order pending appeal.

On January 12, 2022, Gunter left Brazil with the children and returned to the United States. (Doc. No. 1 at 8.) The State Supreme Court of Minas Gerais later found that Gunter, "when traveling back abroad with her children, had not yet been notified of the supersedeas effect of the appeal, and it is evident that she became aware of it on" January 17, 2022, after she and the children arrived in the United States. (Doc. No. 48-3 at 28; *see also* Doc. No. 29-1 (October 9, 2023 opinion of the 3rd Federal Civil and Criminal Court of the SSJ of Juiz de Fora, MG, stating: "[n]ot perceiving any judicial decision restricting her freedom of movement, the mother returned to the United States with the children in January 2022").)

On January 14, 2022, Judge Gambogi entered an order requiring Gunter to appear for proceedings to answer Pereira's allegations that she acted in contempt of court and to determine whether she committed "other crimes, especially when considering the involvement of minors." (Doc. No. 1-16 at 17.)

Gunter, through her attorneys in Brazil, moved for reconsideration of the supersedeas entered by Judge Gambogi. She argued, among other things, that she had not been convicted of kidnapping, that Brazilian appellate courts had previously found that the Brazilian courts lacked jurisdiction over the custody matters, and that the Federal Police investigation Pereira had referenced was based on groundless accusations Pereira himself had made to the police. (Doc. No. 18-5 at 1.) Gunter also stated that she received the children's passports from the Juvenile Court on January 10, 2022, and that she and her attorneys were not aware of the supersedeas when she left the country on January 11, 2022, because the attorneys were on vacation for the end-of-year holidays. (*Id*. at 2.)

On January 20, 2022, Judge Gambogi denied Gunter's request for reconsideration of the supersedeas, making the following findings:

a.   "It should be noted that the appealed order was duly communicated and published whereby, to the best of my knowledge, the fact that the Law Firm where Gunter's lawyers operate granted holidays 'to all lawyers from December 22, 2021, to January 17, 2022' is not sufficient to give rise to revocation of the supersedeas granted to the appeal."[29] (Doc. No. 18-5 at 3.)

---

[29] It should be noted that Pereira has, before this court, claimed to be unable to timely comply with a November 28, 2023 court-ordered deadline to file a joint Rule 26(f) report because he had not yet received an "official copy" of the Court's October 27, 2023 Order in the mail – *even though*, in contrast to Gunter, Pereira *was aware* of the existence of that order and its contents. He had been informed of the existence of the order by opposing counsel, who had provided him a copy of it, and if he had any doubts as to the authenticity of the document opposing counsel provided, he made no timely attempts to contact the Office of the Clerk for verification. (Doc. No. 30; Doc. No. 32; Doc. No. 32-1 (email exchange in which Pereira represented to opposing counsel that he had not received the October 27, 2023 Order and opposing counsel provided him with a copy of it); Doc. No. 34; Doc. No. 34-1; Doc. No. 36; Doc. No. 39; Doc. No. 39-1; Doc. No. 45.) Yet here, Pereira insists on holding Gunter responsible for complying with an order that he obtained *ex parte*, when it is undisputed she did not know about the very existence of that order when she left Brazil, and when that order was later revoked by the State Supreme Court of Minas Gerais.

While on the subject, it should additionally be noted that Pereira later also claimed that he could not comply with the court's October 27, 2023 Order to submit a joint Rule 26(f) report because he injured his shoulder on July 18, 2023 in a motorcycle accident and allegedly aggravated the injury

in October 2023, and also because he was scheduled for surgery on November 27, 2023, the day before the Rule 26(f) report was due. (Pereira provided the undersigned with the date of the injury at the December 4, 2023 hearing when the undersigned inquired into the matter.) Notably, however, during the period of time in which Pereira claimed he had a disabling shoulder injury, Pereira was actively engaged in litigation in this case as well as in Brazil. (*See generally* Docket Sheet; *see also, e.g.*, Doc. No. 21-2; Doc. No. 29-1 at 10; Doc. No. 31 at 1, 5 (indicating that the brief Pereira filed *pro se* on November 13, 2023, was in reply to a document Gunter served on him on October 24, 2023, and also showing the November 7, 2023 mailing date of Pereira's reply brief; Pereira's November 13, 2023 reply brief contained substantive arguments as well as a number of exhibits); Doc. No. 31-1 (Pereira's October 30, 2023 appellate brief in an action in Brazil, appealing the October 9, 2023 decision of the 3rd Federal Court of the SSJ of Juiz de Fora, in which that court revoked its September 5, 2023 Order of Return).) On November 27, 2023, the court provided the parties an extension of time to comply, cooperate, and submit a joint Rule 26(f) report by December 1, 2023, which he also did not do. (Doc. No. 35.)

At the December 4, 2023 hearing, Pereira claimed his lack of compliance was due to his shoulder injury and his recent surgery. Nonetheless, his demeanor at the lengthy December 4, 2023 hearing clearly showed that he was able to communicate to the extent necessary to cooperate with opposing counsel in producing a Rule 26(f) report. He was able to speak for long periods of time, spoke more than anyone else, and in some instances even made extensive legal arguments after the court had instructed him not to. (*See* Doc. No. 45 at 2-3 n.1; Doc. No. 45 at 5 n.3.)

The record and Pereira's demeanor at the December 4, 2023 hearing belie his representation to this court that he was physically unable to manage the effort required to cooperate with opposing counsel to produce a joint Rule 26(f) report by the November 27, 2023 deadline, or by the extended December 1, 2023 deadline. The court has previously discussed other indicators of Pereira's delay-causing bad faith with respect to his handling of the matter, which did cause undue delay. (Doc. No. 35; Doc. No. 45 at 6-7 & n.6; Doc. No. 50.)

Further, in light of the progression of proceedings in Brazil during the same time frame, it is not unlikely that Pereira's inadequate excuses in late 2023 for delaying deadlines and hearings in this case were actually interposed for delay pending his appeal of the October 9, 2023 decision of the 3rd Federal Court of the SSJ of Juiz de Fora, in which that court revoked its September 9, 2023 order requiring return of the children to Brazil. (Doc. No. 31-1.) Notably, on September 27, 2023, before that court revoked its September 5, 2023 return order, Pereira opposed Gunter's request for an extension of time to investigate the existence of the return order (of which she had previously been unaware). (Doc. No. 28.) At that time, Pereira alleged that Gunter's request for additional time "can only serve to protract the due process of law," and he insisted on entry of a judgment in his favor before she could respond. (Doc. No. 28 at 2.) He also misrepresented that Gunter had been properly served with notice of that order and, thus, should not have been surprised by it. (Doc. No. 28 at 2 ¶ 4; Doc. No. 29 at 1-2; Doc. No. 29-1 at 14 (Brazilian court opinion noting the deficient service).) It does not escape the undersigned's notice that Pereira's inadequate excuses for extending deadlines and postponing hearings came about only after the order of return was revoked; whereas, before that date (and while he was allegedly suffering from his aggravated shoulder injury), he participated in the litigation and was so in favor of a speedy resolution that he accused Gunter of attempting to unreasonably protract the litigation merely because she requested a reasonable extension of time to meet a deadline.

b.   "It should also be noted, as stated in the appeal, 'that [Gunter] has significant legal knowledge, as [Gunter] holds a degree in Law,' which means that [Gunter] should have at least acted prudently in this matter, which, *prima facie*, I understand did not occur." (*Id.*)

c.   "From another perspective, considering that the order given by the American court decided for the immediate return of the mother with the children to Brazil for further discussion of the custody of the minors, the mother's return to the United States is unreasonable without the matter being first resolved." (*Id.* at 4.)

d.   "Indeed, whereas the matter of the custody of the minors is still pending, [Gunter] leaving the country without the father being notified is objectionable." (*Id.* at 5.)

Gunter then appealed the supersedeas to the State Supreme Court of Minas Gerais.

On August 11, 2022, the State Supreme Court revoked the supersedeas issued by the Court of Appeals.[30] (Doc. No. 48-3.) In so doing, the State Supreme Court *rejected*

---

[30] In a May 30, 2023 filing in this court, Pereira ascribed great significance to Judge Gambogi's orders and submitted them to the court as grounds for a new argument that Gunter wrongfully removed the children from Brazil in violation of those orders. (Doc. No. 18 at 3-4.) At the same time, he failed to apprise the court of – or provide the court with – the State Supreme Court's order revoking Judge Gambogi's orders. (Doc. No. 18.) In affirming the Juvenile Court's December 17, 2021 Order, the Minas Gerais State Supreme Court's February 14, 2023 Order (a copy of which Defendants filed in this case) referenced a separate State Supreme Court order unanimously reversing the supersedeas of the appeal. (Doc. No. 11-1; Doc. No. 19-1; Doc. No. 19-2.) Therefore, in order to fully understand the basis upon which Judge Gambogi's orders were reversed, and to determine the true legal effect of the supersedeas on January 22, 2022 for purposes of the Hague Convention/ICARA analysis, the undersigned required Gunter to file the State Supreme Court of Minas Gerais's order unanimously reversing the supersedeas, which Gunter subsequently did. (Doc. No. 47 at 2; Doc. No. 48-3).

As it turns out, the order revoking the supersedeas and the State Supreme Court's February 14, 2023 Order both reveal the misleading manner in which Pereira presented Judge Gambogi's orders to this court as proof of wrongful removal, as well as his reliance on false allegations to obtain the supersedeas in the first place. Pereira failed to accurately and fully inform the court that subsequent appellate opinions by the State Supreme Court had (1) reversed the supersedeas, (2) noted the falsity of the very information upon which Pereira had relied to obtain the supersedeas, (3) affirmed an order of sanctions against Pereira for making some of those same false representations before the Juvenile Court, (4) reiterated Brazil's lack of jurisdiction to determine custody, and (5)

Pereira's argument that the December 17, 2021 judgment "allow[ed] the minors to leave Brazil, in defiance of the law and contrary to the provisions of the Hague Convention." (*Id.* at 19-20.) It also specifically rejected his request for sole custody or, failing that, for joint custody. (*Id.* at 20.)

The State Supreme Court noted that the Court of Appeals had previously issued a "final decision" in the Gunter/Pereira divorce case finding that, as to the issue of child custody, "jurisdiction did not lie with the Brazilian Justice, considering that the children have not lived in Brazil for over a year, having their residence established in the United States of America." (Doc. No. 48-3 at 24.) Likewise, the State Supreme Court also noted that the Family Court had rejected Pereira's petition for custody and for the children to reside in Brazil on grounds that Brazilian courts lacked jurisdiction to determine custody, "according to the decision handed down by this [State Supreme] Court" in another interlocutory appeal that was subsequently "confirmed as a result of the dismissal of the

---

*expressly found that the children's presence in the United States as a result of Gunter's removal of the children in January 2022 did not and does not infringe on Pereira's parental rights.* These are key omissions by Pereira which are violative of Rule 11 of the Federal Rules of Civil Procedure. The court, in multiple written orders, has repeatedly warned Pereira about his responsibilities under Rule 11. (*See, e.g.*, Doc. No. 14 (advising Pereira of his Rule 11 responsibilities); (Doc. No. 33 at 2 (advising Pereira of his Rule 11 responsibilities); Doc. No. 40; Doc. No. 45.) *See Tacoronte v. Cohen*, No. 613CV418ORI18GJK, 2014 WL 12873364, at *6 (M.D. Fla. May 9, 2014) (noting that "attempts to ignore and hide relevant, controlling authority," such as omission of relevant case law that would render an argument frivolous, constitute sanctionable conduct under Rule 11).

It is worth noting that Pereira's lack of candor and good faith with this court and others is *why* the undersigned has had to carefully comb through the record itself and painstakingly build an accurate timeline of the facts and legal developments in the case. The task was necessary to ensure that the court was not misled by any attempt by Pereira to rely on an order that had been revoked or reversed, or to otherwise fail to fully represent the facts or the law.

Special Appeal to Brazil's Superior Court of Justice." (*Id*. at 25.) The court noted that, in fact, "concerning the institute of custody of the minors, there are two judgments rendered by this Honorable State Supreme Court, the first one published on December 7th, 2017 … which determined the Brazilian justice system incompenten[t] to adjudicate on the matter regarding custody." (*Id*. at 26.) The court further stated that "it is worth noting that," despite the State Supreme Court's earlier affirmance of the pretrial injunction[31] in an earlier interlocutory appeal in the case, "it should be acknowledged, with all due respect, that the issue of jurisdictional competency" to determine custody "had previously been addressed in another appeal before the" State Supreme Court, "with all available legal avenues exhausted up to the Supreme Court." (*Id*. at 26-27.)

The State Supreme Court went on to find that the supersedeas ran counter to the well-being of the children, as the children had resided in the United States for more than five years, and in light of psychological studies showing that the removal of the children from the United States to Brazil had caused the children psychological distress and anxiety that were compromising their quality of life and required treatment. (*Id*. at 28.) The court also noted the son's attachment to "his older brother, who remained living in the USA," and that the son "has always resided in the United States, learning the language and culture from a young age." (*Id.*) "Based on the reports" of the psychologists, the Supreme Court explained, "it is evident that keeping the children in Brazilian territory is causing them significant distress." (*Id.*) Accordingly, the State Supreme Court concluded that Pereira had

---

[31] It appears the State Supreme Court was referring to an appeal of the February 19, 2021 Preliminary Order of the Juvenile Court. (Doc. No. 48-3 at 26-27; Doc. No. 18-3.)

*not* presented "clear evidence of irreparable harm" as required "to justify the maintenance

of the supersedeas." (*Id.*)

> The State Supreme Court went on to hold:

> In conclusion, I understand that the first instance decision [*i.e.*, the December 17, 2021 Juvenile Court judgment] should take immediate effect, considering that the Principle of the Best Interest of the Children should prevail. The extensive evidence presented in the case shows that, *at least until the issue of custody and the right of visitation is settled in the appropriate court, the family's stay in the United States does not infringe upon the rights of the parents*. Moreover, *I do not perceive the commission of international child abduction*, and any procedural measure must be in perfect accordance with the real and absolute interests of the children. The parents must ensure their protection against any form of oppression that may affect their physical and psychological wellbeing, as enshrined in the fundamental values of the Principle of Human Dignity, Article 1, item Ill, and Article 227 of the Brazilian Federal Constitution.

> ….

> Furthermore, the issued decision ensures the father's right to visitation and contact with the minors, and there is no actual risk to the respondent's relationship with the children that would justify the drastic measure of search and seizure and the maintenance of the supersedeas.

> In view of the above, since the requirements for the plea have not been demonstrated, **I GRANT THE INTERLOCUTORY APPEAL** and **REVOKE THE SUPERSEDEAS**.

(Doc. No. 48-3 at 29-31 (italicized emphasis added; bold emphasis in original).)

On January 4, 2023, Pereira filed his Complaint and Verified Petition in this court,

arguing that, when Gunter removed the children from Brazil on January 12, 2022, she

removed them wrongfully in violation of the Florida court's order to return the children to

Brazil for further custody determinations.[32] (Doc. No. 1.) Again, in doing so, he failed to fully apprise the court of Brazilian court opinions holding otherwise and finding that Gunter's removal of the children in January 2022 did not violate the Hague Convention or his parental rights.

On February 23, 2023, the State Supreme Court of Minas Gerais affirmed the Juvenile Court's December 17, 2021 Order dismissing Pereira's custody action with prejudice, declining to determine custody for lack of jurisdiction, dismissing Pereira's request for primary physical custody, allowing Gunter to travel abroad with the children, allowing Pereira visitation, and convicting Pereira for vexatious proceedings. (Doc. No. 19-2 at 40 (dismissing Pereira's appeal and "upholding the excellent decision that was rendered" by the Juvenile Court); Doc. No. 48-1; Doc. No. 49-1.) Upon summarizing the parties' arguments and the attorney general's opinion[33] (Doc. No. 19-2 at 27-29), the State Supreme Court ruled as follows:

---

[32] According to Pereira, at the time he filed the Complaint and Verified Petition in this action, the parties were involved in four different legal proceedings in Brazil: (a) two proceedings in the Third Family Court of Juiz de Fora (Docket Nos. 5013915-88.2016.8.13.0145 and 5003570-87.2021.8.13.0145); (b) the Juvenile Court of Juiz de Fora /3rd Family Court of Juiz de For a (Docket No. 0003138-90-2020.8.13.0145); and (c) the Superior Court of Justice (Docket No. 0085044-95.2021.3.00.0000 or 2021/0085044-0). (Doc. No. 1 at 8.)

[33] A prosecutor for the Court of Appeals, apparently on behalf of the Office of the Attorney General, also presented a brief regarding Pereira's conviction for vexatious proceedings, stating:

> [Pereira] *considered it necessary to file the present case because he does not agree with the decision rendered in Case No. 5013915-88.2016.8.13.0145, by the 3rd Family Court [in the divorce action]* and upheld in the court of appeals, whereby the judge found the Brazilian courts to have no jurisdiction to rule on the requests for custody and visitation of his minor children, who lived with their mother in the United States.

(Doc. No. 19-2 at 45 (concurring opinion of Judge Teresa Cristina Da Cunha Peixoto) (quoting the Attorney General's brief) (emphasis added).)

a.  Regarding Pereira's request for a supersedeas: The State Supreme Court rejected Pereira's request that a supersedeas be granted and the children's passports be confiscated again. (*Id*. at 28, 30-31.) The court noted that it had already reversed Judge Gambogi's "urgent anticipatory decision" imposing a supersedeas (1) because Pereira failed to show a likelihood of success on the merits in light of a previous State Supreme Court Decision, as affirmed by Brazil's Supreme Court of Justice, holding that Brazil's courts lacked jurisdiction to decide custody; (2) because the supersedeas was not in the best interests of the minors; and (3) because Pereira failed to show a likelihood of harm to justify the supersedeas, as the "inexistence of risk" to Pereira's parental rights had been "proven," and the Juvenile Court's final order "assured … the coexistence of the minors with [Pereira] by means of visitation." (*Id*. at 30-31.) The State Supreme Court concluded that the reasoning in its August 11, 2022 decision revoking the supersedeas controlled the issue, so the court again denied Pereira's request for a court order prohibiting the children from leaving Brazil.

b.  Regarding Pereira's argument that he had been denied the right to be heard: The State Supreme Court rejected Pereira's argument that the Juvenile Court denied him the right to be heard by failing to hold a hearing with witnesses and by failing to order further psychosocial studies of the children. (*Id*. at 31-33.) The court reasoned that, despite having the opportunity to do so, Pereira had not provided a witness list as required, and had not met his burden to properly request that additional evidence be taken or heard. (*Id*. at 32-33.)

c.  Regarding Pereira's request for joint custody, seizure of the children, and for the children to reside with him in Brazil: The State Supreme Court addressed Pereira's request for joint custody or residence of the children in his home and rejected that argument in a substantial discussion. (*Id*. at 28-29, 33-39.) In so holding, the State Supreme Court was well aware of the Florida courts' rulings and summed them up accurately, including the order to return to Brazil for a custody determination; yet, the State Supreme Court of Minas

---

The prosecution argued that the appeal should be dismissed on the merits as a sanction, stating:

Such sanction is due to *the distortion of the truth by [Pereira], who for several times distorted the facts, provided untrue and/or incomplete information, in addition to disturbing the case with delaying requests aimed at postponing the judgment and the forced retention of the minors in [Brazil]*. For all the above reasons, I understand that the decision should be upheld.

(*Id*. at 29 (emphasis added).)

Gerais still concluded that Brazil had no authority to determine custody and that the Juvenile Court had rightly dismissed Pereira's custody claims for lack of jurisdiction. (*Id*. at 36-38.) The court observed that the social and psychological studies showed the children's move to Brazil had caused one child separation anxiety disorder and caused the other child psychological suffering that required ongoing treatment. (*Id*. at 37-38.) The court also rejected Pereira's request to restrict the children's exit from Brazil on grounds that Pereira had failed to demonstrate that he was entitled to such relief and, on the contrary, the evidence had "proven the residence of [the] minors in the United States of America." (*Id*. at 38.) Therefore, the State Supreme Court concluded that the "*the [Juvenile Court's] determination to return the passports so that the children, along with their mother, returned to the country of their residence [i.e., the United States], and remain there, is correct*." (*Id*. (emphasis added).) Further, the court found Pereira's request for a Search and Seizure warrant for the minors was against the children's best interest. (*Id*.) In addition, the court found the Juvenile Court's final decision "*assures the father's right to visitation and contact with [the children], and there is no effective risk to the father to justify its revocation.*"

d.  The State Supreme Court affirmed the Juvenile Court's conclusion that the proceedings were vexatious, the fine levied on Pereira as a sanction for vexatious litigation, and the Juvenile Court's determination that Gunter did not act vexatiously and that there was no misconduct on her part. (Doc. No. 19-2 at 39-40.) The State Supreme Court concluded that the Juvenile Court correctly found Pereira "presents facts that do not match reality, such as the permanence of children in American territory without his permission, distorting the truth, because it appears from the records that it was [Pereira] who decided to return to Brazil, leaving the family on U.S. soil." (*Id*. at 40.) The State Supreme Court further rejected Pereira's claims that Gunter wrongfully "carried out the international kidnapping of the children," when she returned to the United States in January 2022 after the Juvenile Court entered its decision, "when, in fact, it was the Brazilian Justice itself that delivered the children's passports, and then the mother returned to her country of residence." (*Id*.) "Thus," the States Supreme Court concluded, Pereira's "punishment for vexatious proceedings is irreparable." (*Id*.)

On June 26, 2023, Brazil's Superior Court of Justice entered a decision[34] in a separate action Pereira had filed seeking domestication of the Florida court's judgment. (Doc. No. 20-2.) The Superior Court of Justice held that the January 6, 2020 Order of the Florida District Court was subject to domestication. (*Id*. at 12.) In so holding, the Superior Court of Justice found that previous final decisions by Brazil's courts finding that Brazil lacked jurisdiction to determine custody held no *res judicata* effect because they had been entered without prejudice for lack of jurisdiction, and because, under Brazilian law, child custody and child support orders, both foreign and national "are not definitive and may be revised at any time." (*Id.* (emphasis omitted).) The Superior Court of Justice described the state of affairs leading up to the date of its order of domestication as follows:

> As both parties could not agree on the matter [of whether the family would return to Brazil after Pereira's medical residency did not materialize], two actions were initially filed – one for a contested divorce in Brazil, filed by [Gunter] and another for wrongful retention of the minors in the United States of America, filed by [Pereira]. In the divorce action, the National Court stated its lack of jurisdiction to review the claim for child custody. In the action for wrongful retention of the minors, the Foreign Court stated lack of jurisdiction to decide on the child custody matter in that country, thereby affirming the jurisdiction of the Brazilian Court and determining the return of the children to Brazil.

> Thus, *the facts now included in these records demonstrate a lack of jurisdiction of both the Foreign Court and the Brazilian Court to decide on the custody of [Pereira's] and [Gunter's] minor children*.

(Doc. No. 20-2 at 9 (emphasis added).)

---

[34] On grounds that she lacked the means to defend that action without prejudice to her ability to provide for her family's support, Gunter requested and was granted free legal aid in the domestication proceeding before the Superior Court of Justice. (Doc. No. 20-2 at 7-8.)

Although the Superior Court of Justice found that the January 6, 2020 Order of the Florida District Court was subject to domestication, it did not find that *any* other orders or court opinions in the Florida case were subject to domestication. Notably, the Superior Court of Justice held that the Florida District Court's January 13, 2021 Order requiring Gunter to return the children to Brazil *was not* capable of domestication because, among other reasons, *the order for the children's return to Brazil had already been "complied with, as the records clearly indicated that the children returned to the country and city of origin, and in fact were enrolled in a private school in Juiz de Fora/MG to continue their education, which denotes the ineffectiveness of the instrument*." (*Id.* at 11 (emphasis added); *see also id.* at 9 (noting that the January 13, 2021 Order was "fulfilled"); Doc. No. 29-1 at 10-14 (finding that the January 6, 2020 Order of the Florida Circuit Court also had been fully satisfied by Gunter's return to Brazil in 2021).)[35]

Possibly on August 12, 2023,[36] Pereira (through a team of five attorneys acting on his behalf (Doc. No. 24-2 at 3)) filed an action before the 3rd Federal Civil and Criminal

---

[35] Pereira also unsuccessfully sought domestication of the District Court's February 13, 2020 order denying Gunter's motion for reconsideration of its January 6, 2020 Order, the November 16, 2020 decision of the Florida Court of Appeals affirming the District Court's January 6, 2020 Order, and the November 30, 2020 decision of the Florida Court of Appeals denying rehearing. (Doc. No. 20-2 at 10.) The Superior Court of Justice held that those opinions could not be domesticated because they were interlocutory in nature and not the final, effective, unappealable decision in the action. (*Id.* at 11.)

[36] Pereira states in a motion that he filed a petition in the 3rd Federal Civil and Criminal Court on August 12, 2023. (Doc. No. 24 at 1.) This seems plausible, though the exact date of the filing of that petition is not reflected in the evidentiary submissions before the court. The undersigned is reticent to rely solely on Pereira's word, given his pattern of misrepresentations to this and other courts. The exact date of the filing of that action is not critical to the resolution of the matters addressed in this Order and Recommendation, so at this time the undersigned makes no definitive finding as to the date that case was filed.

Court of the SSJ of Juiz de Fora, Minas Gerais, Brazil seeking (1) an order enforcing the now-domesticated January 6, 2020 Order of the Florida Circuit Court; (2) a court request for international legal cooperation for the execution of a warrant for the search, seizure, and return of the children; and (3) implementation of a penalty against Gunter for litigation in bad faith. (Doc. No. 24-2 at 3.) Without setting out any analysis as to whether or why the January 2022 removal of the children from Brazil violated the Florida court's orders, the court granted the petition on September 5, 2023. (*Id*. at 5.)

Once Gunter learned[37] about the September 5, 2023 Order entered by the 3rd Federal Civil and Criminal Court of the SSJ of Juiz de Fora, Minas Gerais, Brazil, she

---

[37] Gunter states that she learned about (and was "surprised" by) the September 5, 2023 Order when Pereira filed a copy of it in this case. (Doc. No. 26 at 1-2; Doc. No. 29 at 1-2.) No attorney is listed for Gunter in the documentation that accompanies the September 5, 2023 Order, although five attorneys are listed as appearing on Pereira's behalf. (Doc. No. 24-2 at 1.) Pereira contends that, immediately after filing the Petition before the [3rd] Federal Court to enforce the Florida decision, [his] attorneys filed a motion to have [Gunter's] attorneys registered in the electronic court proceeding." (Doc. No. 28 at 2 ¶ 4.)

Not surprisingly at this point, Pereira's claim that he had served Gunter turns out to have been misleading. Gunter had previously requested and was granted free legal aid in the domestication proceeding before the Superior Court of Justice. (Doc. No. 20-2 at 7-8.) The 3rd Court of Federal Justice, in revoking the September 5, 2023 return order, stated: "[I]t is worth pointing out that the claim to [serve Gunter] in the person of the lawyers who represented her in the proceedings before the Superior Court of Justice … is unfounded since the power of attorney was only granted to them for that specific purpose and does not extend to receiving service of process on behalf of the principal or representing her in other proceedings." (Doc. No. 29-1 at 14; *see* Doc. No. 29 at 1-2.)

A number of items are worth emphasizing. First, at the December 4, 2023 hearing, Pereira, who is proceeding *in forma pauperis* (Doc. No. 8), claimed to be proceeding *pro se* because he is unable to afford even a single attorney in this action. (*But see* Doc. No. 29-1 at 12 (October 9, 2023 Order of the 3rd Federal Civil and Criminal Court of the SSJ in Juiz de Fora, MG, noting that "[o]n May 17th, 2023, the ACAF provided the father with contact information for a U.S. attorney made available by the U.S. Central Authority, who would be willing to work for free in his case. On July 18th, the father indicated that he would continue with the legal case in the U.S. courts on his own behalf.").) Yet, he has a sizeable team of attorneys at his disposal in Brazil. (*See, e.g.*, Doc. No.24-2 at 3 (listing five attorneys appearing on Pereira's behalf before the 3rd Federal Civil and Criminal Court); Doc. No. 1-15 at 32 (May 16, 2022 email from Pereira to ACAF listing at least three

successfully challenged it. (Doc. No. 29-1.) On October 9, 2023, the 3rd Federal Civil and

Criminal Court revoked its own September 5, 2023 Order of Return. (*Id.*) The 3rd Federal

Civil and Criminal Court noted Pereira's admission that, on March 11, 2021, Brazil's

Federal Administrative Central Authority ("ACAF") dismissed Pereira's previous June 7,

---

lawyers then working on his behalf to attempt to obtain an order from a court in Minas Gerais authorizing the international search, seizure, and restitution of the children).)

Second, once Gunter appeared before the 3rd Federal Civil and Criminal Court in Minas Gerais, *that* court quickly realized that *it* had been incorrectly led to issue the September 5, 2023 return order and quickly retracted it, noting that Gunter had not been properly served and that the Florida court's order requiring Gunter to return to Brazil had already been fulfilled (as several Brazilian courts had previously noted). It is reasonable to conclude that, as he has also done in this court, Pereira was not initially fully forthcoming with the 3rd Federal Civil and Criminal Court Gerais about the nature and implications of the domesticated Florida court order. Had the 3rd Federal Civil and Criminal Court been aware of the facts, it would have initially ruled differently on his petition, as its retraction order makes clear.

Third (and finally), by attempting deceitfully to play the courts off against one another across international borders to deprive Gunter of due process, Pereira has compounded his acts of misrepresentation, vexatiousness, and bad faith. In any case, that would be a grave matter. This is not any case; it is a Hague Convention proceeding. Its very purpose is to protect children from the harm parents cause when they cross borders to obtain undue advantages in child custody matters. *See De Carvalho v. Carvalho Pereira*, 308 So. 3d at 1081. Pereira is well aware of the psychological stress these very proceedings are causing his children; he himself filed evidence of it. (Doc. No. 31-2; Doc. No. 31-3.) As the State Supreme Court of Minas Gerais previously exhorted Pereira in rejecting one of his many challenges to Gunter's January 2022 return to the United States with the children: "[A]ny procedural measure must be in perfect accordance with the real and absolute interests of the children. The parents must ensure their protection against any form of oppression that may affect their physical and psychological wellbeing." (Doc. No. 48-3 at 29.) And, as the undersigned also previously exhorted Pereira, bad faith and dishonest behavior "would certainly undercut his contention that he is truly desirous of resolving the custody issue and acting in the best interests of his children." (Doc. No. 30 at 2.) "In fact," the undersigned warned, "such behavior, which is inherently antithetical to the expedient resolution of this matter, would bolster [Gunter]'s allegations that this action was instead filed for vexatious purposes of harassment…. [G]oing forward, [Pereira] should match his actions with his professed intentions, lest he be caught in a contradiction." (*Id.* at 2-3.) Now, the contradiction has caught Pereira. Though Pereira claims to be the left-behind parent, it is fully apparent that he, not Gunter, is the one on an international forum shopping spree in stark abandonment of the very duties of candor and good faith that are essential to the expedient, just resolution of the custody of his children. It is not clear whether his motive is merely to obtain an improper advantage over Gunter in custody proceedings, or something more sinister. What is clear is that he has violated Rule 11 to the extreme.

2016 request for international legal cooperation as having been completed because, on February 20, 2021, Gunter and the children returned to Brazil "in accordance with the [Florida] judgment ratified by the Supreme Court of Justice … thus revealing the lack of object of this execution of the foreign judicial order." (*Id*. at 12.) The court noted that, "[n]ot perceiving any judicial restriction on her freedom of movement, [Gunter] returned to the United States with the children in January 2022." (*Id*. at 13.) The court then went on to provide the following analysis:

> The judgment that [Pereira] intends to enforce in this enforcement of judgment is the one issued by the Clay County Court in Florida, which "determined the habitual residence of the minors as Brazil and therefore ordered [Gunter's] immediate return to the country so that the matter of custody between the parents could be decided here …." *However, it is worth repeating that the effectiveness of the judgment has been expired, as [Gunter] complied with what was decided by the Clay County Court, returning to Brazil with the children on February 20th, 2021, which led to the closure of the International Legal Cooperation Process on March 11th, 2021. [Pereira] himself acknowledges in his initial pleading that the judgment has already been complied with by [Gunter] ...*
>
> ….
>
> Although the judgment handed down at the [fir]st instance by the Clay County Court in Florida, United States, was ratified by the Superior Court of Justice … *the obligation embodied in it has been fulfilled without the need for Brazilian judicial intervention, which occurred with the mother's return to Brazil with the children in 2021.*
>
> As the Superior Court of Justice emphasized in the very decision that ratified the judgment … , "It should also be noted that the judgment that establishes custody and/or support is subject to the state of fact and law, and is subject to modification, which means that it does not represent a controversy resolution with strict finality. In this regard: 'It should be clarified that judicial decisions, whether foreign or domestic, regarding child custody and support, do not have a character of finality and can be reviewed at any time, provided there is a change in the state of fact' …"

In this case, it is clear that there has been a change in both the factual and legal circumstances that occurred after the judgment being sought for enforcement; *the new return of the mother with the children to the United States in January 2022, after complying, in 2021, with what was determined in the judgment handed down at [fir]st instance by the Duval/Clay County Court, represents a new fact, not covered by the judgment that [Pereira] intends to enforce in this case.*

So much so that [Pereira] was forced to file a new lawsuit in the United States, because the title previously formed before the US courts had its effectiveness expired with the children's return to Brazil. If that were not the case, the Plaintiff could simply request the American authorities to enforce the judgment that had already been formed. As already noted, the new case was filed before the US District Court for the Middle District of Alabama - No. 2:23-cv-00005-ECM-JTA.

*Therefore, the decision handed down by the [fir]st instance of the Duval/Clay County Court, located in Jacksonville, Florida, which ordered the return of the couple's children from the United States of America to Brazil, was duly executed*; this fact is clearly evidenced in the case files, since the minors effectively returned to the country and to their city of origin; in addition, they were enrolled in a private school in Juiz de Fora/MG, thus demonstrating that the effects of this decision were fully complied with.

*In this context, [Pereira] lacks interest and this enforcement of judgment should be dismissed.*

For all the above reasons, I revoke the [September 5, 2023] decision … and dismiss the case without prejudice, due to the lack of interest, under the terms of article 485, item VI, of the CCP.

(Doc. No. 29-1 at 13-14 (citations omitted; emphasis added).)

Pereira has appealed the retraction of the September 5, 2023 Order. (Doc. No. 31-1.) The outcome of that litigation remains to be seen.[38]

---

[38] Similarly, the undersigned is aware that an action for paternal grandparent visitation is also pending. (Docs. No. 31, 31-2.) But, there is no information in the record identifying the jurisdiction in which that litigation was filed, when it was filed, or the current status of that case.

On November 16, 2023, the Superior Court of Justice denied an interlocutory appeal Gunter had filed challenging the domestication of the Florida Circuit Court's January 6, 2020 Order. (Doc. No. 44-1.) The court denied the appeal on grounds that she did not challenge the rationale of the court that issued the opinion, but rather "limited herself to repeating the arguments presented in the initial defense" of the domestication action. (*Id.* at 3, 9.)

B.     Credibility Finding

The undersigned has not made a systematic attempt to catalog every instance in which it appears that Pereira acted in bad faith, with lack of candor before this court and Brazil's courts, in violation of his obligations under Rule 11 of the Federal Rules of Civil Procedure, or to interpose delay in apparent furtherance of forum shopping to gain an advantage. However, Pereira has frequently required reminding of his obligations under Rule 11 of the Federal Rules of Civil Procedure, particularly the obligation to litigate this case in good faith and to deal in good faith with the court, opposing counsel, and the opposing party. [39] The undersigned has also "caution[ed] [Pereira] that how he chooses to

---

[39] (*See, e.g.*, Doc. No. 14 (advising Pereira of his Rule 11 responsibilities and stating: "Both parties are expected to proceed in a professional manner regarding this litigation, but [Pereira]'s actions fall short here with respect to his request for sanctions."); (Doc. No. 33 at 2 (advising Pereira of his Rule 11 responsibilities and stating: "[I]f [Pereira] has indeed engaged in the communications reflected in the email that is attached as an exhibit to the Motion to Sanction Plaintiff for Refusal to Comply with October 27, 2023 Order (Doc. No. 32-1), that sort of delay-causing, irresponsible, blame-shifting behavior would certainly undercut his contention that he is truly desirous of resolving the custody issue and acting in the best interests of his children." It later turned out to be undisputed that Pereira *did* engage in the behavior in question. (*See* Doc. No. 34 and Exhibits thereto, submitted by Pereira himself)); Doc. No. 35 at 2 n.1 ("Pereira's failure to act in good faith is evidenced by the email exchange between him and Gunter's counsel."); Doc. No. 40; Doc. No. 45.)

behave toward this litigation, the court, and the opposing party and her counsel reflects on his credibility and directly on the issues in this case." (Doc. No. 33 at 2.)

As noted at various points in Section IV.A. of this Order and Recommendation, Pereira has not always acted with the requisite candor and good faith before this court and before courts in Brazil. In addition, the undersigned observed his demeanor at the lengthy December 4, 2023 hearing, which drastically conflicted with his representations that he was too disabled to even communicate with opposing counsel to the extent necessary to cooperate in jointly and timely preparing a Rule 26(f) report.

Additionally, it should be noted that Pereira swore to and signed every single one of his filings in this action under penalty of perjury, including those containing the misrepresentations expressly identified in this Order and Recommendation. (*See*, *e.g.*, Doc. No. 1 at 12; Doc. No. 28 at 2; Doc. No. 31 at 3.)

For these reasons, the undersigned finds that Pereira is not credible, engages in a pattern of making misleading representations to this court and other courts as well, and has caused undue delay by acting in bad faith toward opposing counsel, including with respect to the preparation of the Rule 26(f) report.

The undersigned's Recommendation on Pereira's petition and on Gunter's dispositive motions turns on the facts and the law, not on Pereira's credibility or bad faith. The undersigned nevertheless makes this credibility finding on the record. It is, after all, the underlying spirit of the Hague Convention to prevent parents from forum shopping and from playing courts in different jurisdictions off against one another in an attempt to obtain

an advantage in custody litigation.[40] *Baran*, 526 F.3d at 1344; *De Carvalho*, 308 So. 3d at 1081. Pereira has acted in contravention to this spirit. Notwithstanding, the undersigned refrains from *sua sponte* considering imposition of sanctions because Pereira is proceeding *in forma pauperis* from abroad and because the parties and their children need these proceedings to come to a prompt, final resolution on the merits.

## V.   PROCEDURAL HISTORY

Despite largely successful efforts to expedite these proceedings, the procedural history of this case has been extensive and at times unnecessarily complicated by Pereira's *pro se* status,[41] by delays in service by international mail, by Pereira's failure (as

---

[40] Pereira often accuses Gunter of forum shopping in violation of the policy underlying the Hague Convention. Those allegations are unfounded. It is telling that, other than the original divorce and custody action, *which Gunter filed in Brazil*, Gunter has not been the party filing multiple lawsuits and petitions in various courts and jurisdictions and in two different countries. *Pereira* is the one doing that. The fact that Gunter has appeared in actions Pereira filed here and in Brazil to defend herself does not mean *she* is forum shopping. Most telling is the fact that there is absolutely no evidence that Gunter has at any point attempted to use the children's presence in the United States as grounds for obtaining a custody determination from a court in this country. *See De Carvalho*, 308 So. 3d at 1081 (Fla. Dist. Ct. App. 2020) ("'[T]he Convention seeks to deter parental abductions by eliminating the primary motivation for abductions, *which is to obtain an advantage in custody proceedings by commencing them in another country*.'" (quoting *Strout*, 864 So. 2d at 1277 (citing in turn *Holder*, 305 F.3d at 860))). That the parties have been for so long without a forum willing to determine custody is the direct result of *Pereira's* choice to file a Hague Convention action in Florida, where he successfully obtained a decision contrary to the earlier Brazilian court decisions that were adverse to his interests as to the proper jurisdiction for the custody determination. In this sense, it appears Pereira hoisted himself by his own forum-shopping petard.

[41] The undersigned has previously noted that, though Pereira claims to be proceeding *pro se*, it is evident that he is proceeding with the assistance of his attorneys in Brazil. (Doc. No. 45 at 5 n.5.) Indeed, Pereira stated the same at the December 4, 2023 hearing when he stated his desire to have his Brazilian attorneys contact Gunter's counsel for the Rule 26(f) report. Nevertheless, he is responsible for his own pleadings and signed them in accordance with Rule 11, and his own behavior when interfacing with the court and opposing counsel as a *pro se* litigant has caused delay and undue burden. (*See, e.g.*, Doc. No. 45 (noting several occasions in which Pereira's behavior delayed proceedings and caused expense).)

documented in prior orders)[42] to deal in candor and good faith with opposing counsel (and at times with the court), and by several extra rounds of briefing occasioned by new developments and court opinions in the various cases ongoing in Brazil. Therefore, the undersigned will not belabor the recitation of the procedural history of this action, except to refer the reader to the docket and to point out that the December 27, 2023 Order (Doc. No. 45) and the January 29, 2024 Order (Doc. No. 50) explain why there was and will be no hearing before the undersigned on Pereira's Complaint and Verified Petition or on Gunter's Motion for Summary Judgment. As previously explained in more detail, such a hearing is neither required nor necessary under the circumstances of this case, and so would only serve to cause unnecessary delay in an action the court is obligated to expedite. *Lops v. Lops*, 140 F.3d 927, 936, 943 (11th Cir. 1998) ("Article 11 of the Hague Convention contemplates that courts shall expedite … proceedings," and "ICARA requires expedited judicial proceedings."); *Pereira v. Gunter*, No. 2:23-CV-5-ECM-JTA, Doc. No. 45 (December 27, 2023 Order), 2023 WL 8937582, at *1 (M.D. Ala. Dec. 27, 2023) ("[B]ecause expeditious resolution is mandated in cases filed under the Hague Convention and ICARA, the court has broad discretion as to how to proceed, and 'nothing requires [this] court even to hold an evidentiary hearing' or oral argument. *Gil-Leyva v. Leslie*, 780 F. App'x 580, 588 (10th Cir. 2019)."); *Pereira v. Gunter*, No. 2:23-CV-5-ECM-JTA, Doc. No. 50 (January 29, 2024 Order), 2024 WL 329145, at *1 (M.D. Ala. Jan. 29, 2024) ("[N]o hearing is necessarily required, as this is a Hague Convention/ICARA proceeding and it

---

[42] (*See, e.g.*, Doc. No. 14; Doc. No.  33 at 2-4; Doc. No. 45; Doc. No. 50.)

must be expedited rather than prolonged in hopes that Pereira will one day be willing and able attend a hearing in person."); *see also Dionysopoulou v. Papadoulis*, No. 8:10-CV-2805-T-27-MAP, 2010 WL 5439758, at *2 n.1 (M.D. Fla. Dec. 28, 2010) (noting the mandate to expedite ICARA petitions and the lack of a requirement for a hearing under either the Hague Convention or ICARA).

The Petition (Doc. No. 1), Motion to Dismiss (Doc. No. 11), and Motion for Summary Judgment (Doc. No. 11) [43] are ripe for disposition, as are Pereira's July 10, 2023 Motion to Serve Supplemental Pleadings (Doc. No. 20) and Pereira's September 12, 2023 Motion to Serve Supplemental Pleadings (Doc. No. 24).

## VI.    ANALYSIS

A.    Motions to Serve Supplemental Pleadings (Docs. No. 20, 24)

Gunter opposes Pereira's Motions to Serve Supplemental Pleadings (Docs. No. 20, 24) on grounds that they do not satisfy the procedural requirements for a motion to amend pleadings under Rule 15 of the Federal Rules of Civil Procedure and on grounds that amending the pleadings would be futile. (Docs. No. 22, 26, 29.) *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) (noting that, though Rule 15(a) requires that leave to amend be "freely given" when justice requires, leave may be denied where an amendment is futile).

---

[43] By Order entered April 14, 2023, the court converted Gunter's Motion to Dismiss to a Motion for Summary Judgment in accordance with Rule 12(d) of the Federal Rules of Civil Procedure. (Doc. No. 12.) The court ordered briefing on the motion and timely notified the parties of the applicable standard of review, the right to file evidence with respect to the motion, and the consequences of failing to respond to the motion. (*Id.*)

In essence, Pereira's motions seek to provide additional evidence and argument in support of his Verified Petition and in opposition to Gunter's summary judgment motion. (Doc. No. 1.) The evidence offered by Pereira on his motions to supplement consists largely of newly-available materials that were not previously available, such as opinions from Brazil's courts that were entered after briefing on the summary judgment motion had closed in this case. In addition, Pereira submitted some duplicate documents that had previously been submitted during summary judgment briefing. (*E.g.*, Doc. No. 23-1.) Gunter has fully responded to Pereira's supplemental evidence and arguments and has presented evidence and arguments in opposition. (Docs. No. 22, 26, 29.)

Courts have discretion to allow supplementation of the summary judgment record. Fed. R. Civ. P. 56(c)-(e); *Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594, 600 (11th Cir. 2015) In particular, "a court may permit parties to supplement the summary judgment record with newly discovered or previously unavailable evidence, where doing so would allow for the 'efficient and expedient resolution' of the case on the merits." *AIM Recycling of Fla., LLC v. Metals USA, Inc.*, No. 18-CV-60292, 2019 WL 5963815, at *3 (S.D. Fla. Nov. 13, 2019) (citing *Dietz v. Bouldin*, 579 U.S. 40, 48 (2016)).

The court finds that, except for duplicate evidence that has no impact on the proceedings, the evidence with which Pereira seeks to supplement the record is previously unavailable evidence that he filed within a reasonable time after it came into existence. Gunter will suffer no prejudice by allowing the supplementation because she was provided a full and fair opportunity to respond to Pereira's new arguments and evidence with her own, and she did so. Further, to the extent that Gunter was surprised by the supplemental

evidence due to Pereira's securing of a new order of return in Brazil without adequate notice to her, she was subsequently able to obtain orders from the Brazilian authorities revoking rulings entered without her notice, which she has also submitted to the court. In fact, as indicated below, even with the supplemental evidence, Pereira is not entitled to a ruling in his favor.

The court is mindful that the ordinary necessity of efficiently and expediently deciding the case on the merits is heightened in Hague/ICARA cases seeking the return of children to their place of habitual residence. *See Dietz*, 579 U.S. at 45, 47 (invoking "Rule 1 [of the Federal Rules of Civil Procedure]'s paramount command: the just, speedy, and inexpensive resolution of disputes" and the federal courts' inherent powers "to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases"); *Lops*, 140 F.3d at 936, 943 (noting that both Article 11 of the Hague Convention and ICARA require expedited judicial proceedings). The court finds that considering Pereira's supplemental evidence and Gunter's responses thereto allows more efficient resolution on the merits after consideration of all relevant materials and arguments submitted by both parties. Accordingly, in its discretion under Rules 1, 15(a), 15(d), and 56(c)-(e) of the Federal Rules of Civil Procedure, and in accordance with its inherent power to manage its docket, the court will grant Pereira's motions to supplement. (Docs. No. 20, 24.)

B.    Merits of Pereira's Petition and of Gunter's Motion for Summary Judgment (Docs. No. 1, 11)

It is undisputed that, on January 12, 2022, Gunter removed the parties' children from Brazil to the United States. However, to make his *prima facie* case that he is entitled to an order returning the children to Brazil, Pereira must prove the following by a preponderance of the evidence: (1) that the children were habitual residents of Brazil in January 2022, immediately before their removal to the United States; and (2) that Gunter's removal of the children on January 12, 2022, was "wrongful" in that it (a) breached Pereira's custody rights under Brazilian law and (b) at the time of removal, Pereira had actually been exercising his custody rights, or would have been, but for the removal. *See Berenguela-Alvarado*, 950 F.3d at 1358; *see also* 22 U.S.C. § 9003(e)(1) (providing that the petitioner "shall establish by a preponderance of the evidence … that the child has been wrongfully removed").

1.    Place of Habitual Residence

Pereira contends that Brazil is the children's habitual place of residence. In support of this argument, he submitted orders from the Florida courts as well as Brazil's Superior Court of Justice's June 26, 2023 decision domesticating the January 6, 2020 Order of the Florida Circuit Court. (Doc. No. 20-2 at 12.) The undersigned need not resolve the merits of Pereira's argument that, pursuant to those orders, Brazil was the children's place of habitual residence at the time of removal. Rather, for purposes of this analysis, the undersigned assumes, without deciding, that Brazil was the children's place of habitual residence immediately prior to removal. Even so, as discussed below, Pereira has not met his *prima facie* burden to demonstrate that, when Gunter left Brazil with the children on January 12, 2022, she removed them "wrongfully" as that term is defined under ICARA

and the Hague Convention. *Baran*, 526 F.3d at 1344 ("When a parent files a petition for the return of a removed child, the first question courts must ask is whether the removal was wrongful.").

### 2. Wrongfulness of Removal

Assuming then that Brazil was the children's habitual replace of residence at the time of removal, Pereira still must prove that the removal of the children was wrongful. That is, Pereira must demonstrate by a preponderance of the evidence that Gunter's January 12, 2022 removal of the children breached his custody rights under Brazil's laws, and that at the time of removal he actually exercised his custody rights, or would have exercised them but for the removal or retention.[44] *Berenguela-Alvarado*, 950 F.3d at 1358.

> The Convention defines "rights of custody," and it is that definition that a court must consult." This uniform, text-based approach ensures international consistency in interpreting the Convention. It forecloses courts from relying on definitions of custody confined by local law usage, definitions that may undermine recognition of custodial arrangements in other countries or in different legal traditions, including the civil-law tradition.

*Abbott v. Abbott*, 560 U.S. 1, 12, (2010).

Specifically, Article 5 of the Convention provides that,

"For the purposes of this Convention—

a. 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;

b. 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence."

---

[44] Because the undersigned finds Pereira did not establish that Gunter breached his custody rights under Brazilian law on January 12, 2022, the undersigned pretermits discussion of whether Pereira was or would have been exercising any such custody rights at that time.

*Abbott*, 560 U.S. at 8 (quoting Convention, art. 5). Rights of custody under the Hague Convention "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, art. 3.

Parallel litigation in multiple courts has been ongoing, with varied court opinions issued over time. Because the legal landscape has shifted in this case over time, and because Pereira's arguments rely on legal opinions that were issued at various points along the litigation timeline, it is important first to establish the relevant point in time at which to assess whether the January 12, 2022 removal of the children from Brazil interfered with Pereira's custody rights, as determined by Brazilian law. Pereira has not offered any precedent on this point, though it is his burden to establish a *prima facie* case of a custody violation.

The text of the Hague Convention and of ICARA indicate that wrongfulness of removal is determined by reference to the facts and law as they existed at the time of removal, including the law governing the rights of custody of the nonremoving parent at the time of removal. *See* Hague Convention, art. 3 (defining wrongfulness of removal as being a removal in breach of the nonremoving parent's rights of custody "under the law of the State in which the child was habitually resident immediately before the removal or retention," and, "at the time of the removal ... those rights were actually exercised" by the nonremoving parent); *Livingstone v. Livingstone*, No. 22-1308, 2023 WL 8524922, at *4 (10th Cir. Dec. 8, 2023) (unreported) ("'The Convention is very clear that the law of the

country in which the child was habitually resident governs decisions as to whether custody rights existed *at the time of removal*.'" (quoting *Shealy v. Shealy*, 295 F.3d 1117, 1124 (10th Cir. 2002) (emphasis added in *Livingstone*))); *White v. White*, 718 F.3d 300, 306, 308 (4th Cir. 2013) (collecting cases and holding that "the only reasonable reading of the Convention is that a removal's wrongfulness depends on the rights of custody *at the time of removal*" and that "the determination of whether removal is wrongful is based on rights of custody at the time of removal" (emphasis in original)); *see also Lops*, 140 F.3d at 936 ("The removal of a child from the country of his or her habitual residence is 'wrongful' under the Hague Convention if the petitioner 'is, or otherwise would have been, exercising custody rights to the child under that country's law at the moment of removal.' *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) (citing Hague Convention, art. 3)." (footnote omitted)); *Marquez v. Castillo*, 72 F. Supp. 3d 1280, 1285 (M.D. Fla. 2014) (looking to Mexican law to "determine whether Petitioner had custody rights at the time of removal").

Therefore, the undersigned must evaluate whether Gunter interfered with custody rights that Pereira held under Brazilian law on January 12, 2022, the date of the removal in question.

   a.   The Supersedeas and the February 19, 2021 Preliminary Order of the
        Juvenile Court

Pereira argues that, when Gunter removed the children from Brazil on January 12, 2022, she violated his custody rights under Brazilian law by violating the short-lived supersedeas of which she was unaware at that time, which was subsequently revoked on

appeal, and which Pereira obtained in part on the basis of false representations. The undersigned emphasizes that the wrongfulness of removal for purposes of a Hague Convention proceeding turns not on whether the removal violated a supersedeas, but on whether Gunter violated *Pereira's right to custody under Brazil's law* at the time of removal. (Convention, arts. 3, 5.)

In revoking the supersedeas, the State Supreme Court specifically rejected Pereira's argument that Gunter left Brazil in January 2022 "in defiance of the law and contrary to the provisions of the Hague Convention," and rejected his argument that the children must be returned to Brazil forthwith in accordance with the supersedeas and the Hague Convention.[45] (Doc. No. 48-3.)   The State Supreme Court also found that the Juvenile Court's order dismissing the case and restoring Gunter's right to travel to the United States with the children "should take immediate effect" because the supersedeas (and the preliminary injunction it reinstated) improperly ran contrary to the best interests of the

---

[45] Pereira has at times suggested that, for various reasons, Brazil's courts did not have the authority to independently rule on whether the Hague Convention placed jurisdiction over the custody decision elsewhere. This argument is meritless. First, he invited them to rule on the question. Second, Pereira's success in getting the Florida courts to reevaluate the children's place of habitual residence and *disagree* with the Brazilian courts does not necessarily mean that, at the time of removal in January 2022, the Florida courts had effectively *reversed*, nullified, or supplanted the Brazilian courts' prior rulings as to the proper jurisdiction for the custody determination. Third, even our own system recognizes that courts have the inherent authority and obligation to evaluate and determine their own jurisdiction, and are not to act or issue mandates outside of that jurisdiction. *See United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("[I]t is familiar law that a federal court always has jurisdiction to determine its own jurisdiction."); *Romano v. John Hancock Life Ins. Co. (USA)*, No. 19-21147-CIV, 2022 WL 1450770, at *33 (S.D. Fla. May 9, 2022) ("Courts may always evaluate their own jurisdiction in a case, and courts have jurisdiction to determine whether they have jurisdiction."). Thus, for example, the fact that no Hague Convention petition was filed in Brazil did not prevent the Brazilian courts from considering whether, under the Hague Convention, they lacked jurisdiction to determine custody.

children and also because, "*at least until the issue of custody and the right of visitation is settled in the appropriate court, the family's stay in the United States <u>does not infringe on the rights of the parents</u>.*" (*Id*. at 27-29 (emphasis added).) "Moreover," the reporting State Supreme Court Judge continued, "*I do not perceive the commission of international child abduction*" in Gunter's return to the United States. (*Id*. at 29 (emphasis added).) Rather, in his view, the return of the children to the United States protected the children's interests and their physical and psychological well-being while preserving their father's right of access and his relationship with the children. (*Id*. at 29-31)

Later, in its February 14, 2023 ruling in the appeal regarding the merits of the Juvenile Court's decision, the State Supreme Court affirmed Pereira's conviction for vexatious proceedings on grounds of several misrepresentations, including Pereira's claim that the mother "carried out the international kidnapping of the children, when, in fact, it was the Brazilian Justice itself that delivered the children's passports, and then the mother returned to her country of residence." (Doc. No. 19-2 at 40.) The State Supreme Court again expressly rejected Pereira's "request to maintain the restriction of the children's exit from Brazil, the requirements for setting up of such need have not been proven …. *Therefore, the court's determination to return the passports so that the children, along with their mother, returned to the country of their residence, and remain there, is correct.*" (Doc. No. 19-2 at 36.) The State Supreme Court further found that, because the Juvenile Court's decision protected Pereira's rights of access, "there is no effective risk to the coexistence of the father to justify … revocation" of the Juvenile Court's decision. (*Id*. at 39.)

Thus, the State Supreme Court expressly did *not* view Gunter's technical violation of the supersedeas (of which it found Gunter was unaware when she left Brazil (Doc. No. 48-3 at 28)) to have violated Brazilian law, Pereira's parental or custody rights under Brazilian law, or, for that matter, the Hague Convention. Instead, the State Supreme Court revoked the supersedeas and affirmatively stated that Gunter's continued presence in the United States with the children posed no infringement on Pereira's rights. To accept Pereira's invitation to rule to the contrary now would contradict Brazil's own State Supreme Court of Minas Gerais, which *twice* entered opinions finding that Gunter's departure with the children in January 2022 did not violate Brazilian law or Pereira's custody rights. This court must look to Brazil's laws and judicial decisions in determining whether Pereira's custody rights were violated, and this court may consult the judicial and administrative decisions of Brazil's courts in evaluating that question.[46] Convention, arts. 3, 14.

Viewed another way, the relief Pereira seeks would require this court to resurrect and retroactively reinstate the supersedeas and apply it to Gunter, though Brazil's own

---

[46] The June 26, 2023 Order of the Superior Court of Justice domesticating the Florida Circuit Court's January 6, 2020 Order concerns only whether *the retention of the children in Florida in 2016* violated the Hague Convention. It does not specifically address whether Gunter violated Pereira's custody rights under Brazilian law or the Hague Convention by *removing the children from Brazil in January 2022*. Therefore, the domestication order does not preclude this court from considering earlier opinions from Brazil's courts that contain express declarations relevant to whether Gunter violated the Hague Convention or Pereira's custody rights *in 2022*. Further, consulting those opinions with respect to *past* custody rights as they existed in 2022 does not in any way preempt Brazil's courts from reconsidering issues of custody *going forward*. As Brazil's own courts have recognized, decisions on the issue of custody can be modified when circumstances change. (*See, e.g.*, Doc. No. 29-1.)

appellate courts have twice declined the same request on grounds that Gunter did not violate his parental rights or the Hague Convention when she left Brazil with the children in January 2022. The supersedeas is a dead issue now. And it should remain so, especially since Pereira acquired it *ex parte* by presenting several substantial misrepresentations to Judge Gambogi. For example, Pereira "emphasize[d]" to Judge Gambogi "that a psychosocial study established that any change in setting involving the children should take place gradually and … that [Pereira's] life and coexistence with the children has been extremely healthy, *with no circumstantial evidence that the children have suffered any psychological stress by returning to*" *Brazil*. (Doc. No. 18-9 at 3 (emphasis added)). Yet, in revoking the supersedeas, the State Supreme Court extensively discussed how the children's psychological records affirmatively showed that "keeping the children in Brazil is causing them significant distress." (Doc. No. 48-3 at 28.) The court cited psychosocial records diagnosing one child with separation anxiety that was "compromising [the child's] quality of life and pointe[ed] to the possibility of further complications." (*Id*. at 28.) The court further *directly quoted* from another psychosocial report finding that, due to the abrupt rupture of the other child's relationships when that child returned to Brazil, that child was experiencing "psychological suffering that persists until this date, as well as compromising [the child's] personal quality of life, which justifies the need to maintain the child's psychological follow-up."[47] (*Id*. at 28.) The State Supreme Court's citation to and

---

[47] Pereira himself submitted evidence to this court that, as recently as October 2023, this same child had been placed on "self-harm/suicide watch" and was suffering "academic issues related to … low self-esteem and socializing skills, regarding [the child's] current emotional distress circumstances." (Doc. No. 31-2 at 2.) Pereira's evidence further contains Gunter's personal

direct quotations from the psychosocial records[48] disproves Pereira's representation to

Judge Gambogi that there was "*no* circumstantial evidence" that the children had "suffered

---

observation as to the origins of the child's psychological distress. (*Id.*)  According to the evidence Pereira submitted, the child had been forced to contact the paternal grandparents pursuant to a court order entered in a grandparent visitation action. (*Id.*) According to Gunter's observations, in the course of the child's forced contact with the paternal grandparents, the child learned that Pereira had filed this Hague Convention proceeding in this court, "aiming to return" the child and the child's sibling "to Brazil," which, in turn, sent the child into "sudden downfall by means of depression." (*Id.*) It is undisputed that the child is now being provided with ongoing counseling services to address these psychosocial issues through her school and through assistance to military families provided by the Department of Defense. (*Id.*; Doc. No. 31-3.)

These facts are not set out here for any assessment of the child's best interest with respect to continuing care and the potential detrimental effects of a return order; those issues are not before this court, since Gunter did not raise any of the Hague Convention defenses to which they would have been relevant. Rather, these facts are presented only for context, as they are consistent with the psychosocial studies quoted by the State Supreme Court of Minas Gerais and with *that* court's determination that the supersedeas was due to be revoked because, among other reasons, remaining in Brazil was not in the best interests of the children's psychosocial well-being. Further, the information Pereira submitted regarding the child's current psychological distress at the prospect of returning to Brazil adds additional confirmation to the reliability of the psychosocial records upon which the State Supreme Court relied, and which Pereira had previously flatly misrepresented to Judge Gambogi in obtaining the supersedeas in the first place. (Doc. No. 48-3 at 28.)

The court also mentions this issue to document yet another instance of Pereira being less than fully candid with this court. In his "Reply to Defendant's Response to Petitioner's Second Motion to Serve Supplemental Pleadings," Pereira represented to the court that Gunter had reported to him that the child's distress was merely due to "being forced to contact her grandparents." (Doc. No. 31 at 2 ¶ 7.) This was not an accurate characterization of the evidence; the email he attached to his filing reveals that Gunter had reported that the child's psychological distress was *because the child became aware of the prospect of being returned to Brazil due to this lawsuit*, which she *learned about* when she was forced to contact her grandparents. (Doc. No. 31-2.) In light of Pereira's representations to Judge Gambogi, this is not the first time Pereira has, by lack of full candor to a court, failed to properly characterize evidence regarding the effect of a return to Brazil on the child's psychological well-being.

Again, however, Gunter did not raise either the child's psychological well-being or the child's objection to returning to Brazil as a defense to this action; thus, the court does not here take into account the child's alleged reaction to learning of the potential for an order requiring her to return to Brazil. *See* Convention, art. 13; 22 U.S.C. § 9003(e)(2).

[48] Not only did the State Supreme Court quote and rely on the psychosocial records of the children's psychological distress in its August 11, 2022 Order revoking the supersedeas, but it did

*any* psychosocial stress" by returning to Brazil. (Doc. No. 19-3 at 3 (emphasis added)). Not only that, but Pereira made other misrepresentations to Judge Gambogi[49] that were substantially similar to those for which he had been previously convicted of vexatious proceedings and that he later repeated to the State Supreme Court. That court plainly found that Pereira "presents facts that do not match reality" and "distort[s] the truth." (Doc. No. 19-2 at 40.)

Pereira also argues that the February 19, 2021 Preliminary Order of the Juvenile Court constitutes an "expressed Brazilian order stating that both parents shall exercise joint custody." (Doc. No. 23 at 2.) Again, Pereira obtained that order *ex parte* before Gunter landed in Brazil with the children on February 22, 2021. The Juvenile Court's December 17, 2021, Order denied Pereira's petition, returned the children's passports to Gunter, clearly indicated Gunter was free to return to the United States with the children, convicted Pereira of vexatious proceedings, and *expressly revoked all previous orders that were inconsistent with the December 17, 2021 Order*, including the February 19, 2021 Order. (Doc. No. 19-2 at 26-27, 34-35, 39.) To the extent that Pereira may contend that the supersedeas somehow resurrected the February 19, 2021 Preliminary Order, the

---

so again in its February 14, 2023 Order affirming the Juvenile Court's December 17, 2021 judgment. (Doc. No. 19-2 at 37-38; Doc. No. 48-3 at 27-29.)

[49] *E.g.*, Pereira misrepresented to Judge Gambogi that Gunter had been convicted of international minor kidnapping. (Doc. No. 18-9 at 1-2; *see also* Doc. No. 1-16 at 6-9; Doc. No. 19-2 (State Supreme Court decision affirming the Juvenile Court conviction of Pereira for vexatious proceedings for "distort[ing] the truth" and "present[ing] facts that do not match reality" such as his "claim[] that the mother carried out the international abduction of the children").) To be clear, again, Gunter was not "convicted" of anything – much less kidnapping or international child abduction – in Pereira's Hague petition action in Florida, which was a civil action.

undersigned's analysis as to the effect of the supersedeas itself applies likewise to Pereira's argument that the February 19, 2021 Preliminary Order of the Juvenile Court established joint custody.

Further, the undersigned notes that Pereira was dishonest with *this* court by arguing that Gunter's exit with the children from Brazil in 2022 "blatantly violated" the supersedeas and "wrongfully removed the children from Brazil." (Doc. No. 18 at 3-40.) Pereira failed to apprise the court of the existence of the State Supreme Court's August 11, 2022 Order revoking the supersedeas, in which the State Supreme Court expressly found that, when Gunter left Brazil in January 2022, she violated neither the law, nor the Hague Convention, nor Pereira's parental rights. (Doc. No. 18 at 3-4; Doc. No. 48-2 at 33; Doc. No. 48-3.) He also failed to mention the State Supreme Court's February 14, 2023 Order affirming the Juvenile Court's judgment on the merits, in which the State Supreme Court also discussed its earlier revocation of the supersedeas. (Doc. No. 19-2.) Failure to apprise the court of contrary controlling authority of which a litigant is aware, especially appellate court opinions that reversed the very authorities upon which the litigant relies, is fundamentally sanctionable conduct in violation of Rule 11 of the Federal Rules of Civil Procedure.[50]

    b.    The December 17, 2021 Order of the Juvenile Court

---

[50] Due to prior instances of conduct that fell short of Rule 11's requirements, Pereira has been warned on a number of occasions in written orders apprising him of the Rule's requirements and of his obligation to comply with the Rule. (*See, e.g.*, Doc. No. 14 at 8 (advising Pereira of Rule 11's requirement that a *pro se* litigant's arguments are not being presented for any improper purpose, such as harassment or delay, that the arguments are warranted by existing law, and that all factual representations are supportable by evidence); Doc. No. 33 at 2-4; *see also* Doc. No. 45 (noting Pereira's bad faith in concealing relevant information from the court and opposing counsel regarding his ability to comply with a court order, which caused the court and Gunter unnecessary delay and expense).)

Pereira argues that the Juvenile Court's December 17, 2021 Order did not deprive him of joint custody and therefore, under Brazilian law, Gunter was required to obtain a court order or his consent before leaving the country with the children. Pereira argues that the Juvenile Court's December 17, 2021, Order merely allowed the return of the children's passports, but did not alter custody or allow Gunter to return to the United States with the children. (Doc. No. 23; *see, e.g.*, Doc. No. 23 at 3 (characterizing the December 17, 2021 Order as "a not dispositive order granted to solely liberate passports")).)

Pereira has failed to carry his burden with respect to this argument as well. First, from an evidentiary standpoint, he has failed to submit a complete copy of the December 17, 2021 Order of the Juvenile Court. This is his case, and it is his burden to establish a *prima facie* case by a preponderance of the evidence. *Golan*, 596 U.S. at 672-73. It is not enough that he make representations about the order's contents; those contents must appear in the record before this court.

Second, Pereira's arguments are contradicted by what *is* known about the contents of the December 17, 2021 Order. That information comes from the February 14, 2023 Order of the State Supreme Court of Minas Gerais, in which the reporting and concurring Judges both quoted extensively from the December 17, 2021 Order. (Doc. No. 19-2 at 26-27, 34-35, 39, 42-44; *see also* Doc. No. 49-1 at 7.) Those block quotations show that the Juvenile Court made the following rulings:

- on grounds that Brazil was not the proper jurisdiction to determine custody of the children, the Juvenile Court dismissed "with prejudice" Pereira's request for "custody and inversion of the referential home;"

- the Juvenile Court denied Pereira's request to seize the children's passports and prohibit Gunter from leaving Brazil with them;

- the Juvenile Court ordered "the immediate return" of the children's passports to Gunter;

- the Juvenile Court ordered that "an official letter … be sent to the Federal Police, forwarding a copy of this decision, requesting that it remove any prohibition against [Gunter] leaving Brazil *with the minor children*;"

- the Juvenile Court established visitation procedures "in the event of the minors' return to the United States;"

- the Juvenile Court convicted Pereira of vexatious proceedings based on misrepresentations he made to the court in support of his petition; and

- the Juvenile Court *revoked* the Juvenile Court's February 19, 2021 Preliminary Order establishing joint custody.[51]

(Doc. No. 19-2 at 26-27 (emphasis added).)

Again, the December 17, 2021 Order was affirmed on appeal. (Doc. No. 19-2.)

Pereira's arguments are misleading because they fail to account for that fact. (*See*, *e.g.*, Doc. No. 23 at 2-3 (in which Pereira misrepresented that the December 17, 2021 Order "was later reversed," he relied on the supersedeas but failed to acknowledge that the supersedeas *itself* had been reversed, and he failed to truthfully state that the December 17, 2021 Order was *affirmed* on appeal).)

---

[51] It is true that the December 17, 2021 Order did not expressly establish sole physical custody with Gunter *because the court found it had no jurisdiction to establish custody.* The Juvenile Court relied on prior precedent from Brazil's courts to determine that the proper jurisdiction for the custody determination lay in the United States. However, as explained herein, the December 17, 2021 Order expressly removed any prohibition on Gunter's return to the United States, confirmed that the United States was the children's place of habitual residence, and informed Gunter that the United States was the proper jurisdiction for determining custody. In short, it effectively authorized Gunter to unilaterally determine whether the children would return to the United States with her.

In any event, at the time she left Brazil in January 2022, Gunter *had* a court order authorizing her to return to Brazil with the children and expressly informing her that Brazil lacked jurisdiction to determine custody. Pereira argues that Brazilian law required Gunter to obtain some *other* separate court order before leaving the country. In support of this argument, he cites a statute that merely requires "judicial authorization," which Gunter had.[52] Pereira provides no citations to legal authority[53] that would require more. (Doc. No. 23 at 2-3.) Furthermore, as discussed more fully in Section VI.B.2.a. of this Order and Recommendation, the State Supreme Court of Minas Gerais twice issued opinions recognizing that, when Gunter returned to the United States with the children in January 2022, she violated neither the law, nor the Hague Convention, nor Pereira's parental rights. Thus, Pereira has failed to carry his burden to establish that Gunter was required to obtain judicial authorization before leaving Brazil with the children.

Pereira's argument is also circularly flawed because it rests on the presumption that the parties shared joint custody of the children under either Brazil's default laws or under the auspices and effects of the reversed supersedeas. (*Id*. (Pereira's argument presuming that applicability of Brazilian joint custody law required Gunter to obtain his consent or

---

[52] Again, the supersedeas staying the effect of the December 17, 2021 Order of the Juvenile Court was later revoked and, as explained in Section VI.B.2.a. of this Order and Recommendation, did not render Gunter's removal of the children from Brazil a violation of Pereira's rights under Brazilian law at that time.

[53] Pereira makes several additional allegations about what Brazilian law requires, but he does not support those allegations with citations to Brazilian law pertaining to the procedures for obtaining the judicial permission that he claims Gunter failed to obtain. Again, it is Pereira's burden to establish a *prima facie* case. His word is not law. Nor is it particularly trustworthy, as found in Section IV.B.2. of this Order and Recommendation.

judicial authorization to leave Brazil with the children).) Again, at the time Gunter left Brazil, she had not only been authorized to do so by the December 17, 2021 Order finding Brazil's custody laws inapplicable, but she also had in hand a number of other orders from courts in Brazil finding that Brazil's custody laws were not the ones applicable to the case. Pereira alleges that those orders were not final. Even if that were true, as discussed in Section VI.B.2.a., that does *not* necessarily mean that Brazil's custody laws prevented Gunter from leaving at that time without additional authorization, and Gunter was only obligated by the Florida court's orders to remain in Brazil until further orders of Brazil's courts, which is exactly what she did.

  c. The Florida Court's Orders

  In his Petition and throughout this litigation, Pereira has argued that Gunter's return to the United States violated the Florida Circuit Court's order to return to Brazil. The undersigned disagrees.

  First, the Florida Circuit Court did not order Gunter to return to Brazil until all appeals related to the custody of the children had been exhausted. Rather, on January 6, 2020, the Florida Circuit Court found that Brazil was the children's habitual place of residence and the proper jurisdiction for determining custody, granted Pereira's petition, and ordered Gunter to transfer custody of the children to Pereira not later than "January 31, 2020, for return to Brazil." (Doc. No. 1-8 at 25.) Later, on February 13, 2020, the Florida Circuit Court expressly cancel[led] and supersed[ed]" the portion of the January 6, 2020 Order that directed Gunter to transfer custody of the children to Pereira for their return to

Brazil. (Doc. No. 1-9 at 8-9 ¶¶ 4, 6.) That portion of the January 6, 2020 Florida Circuit Court Order is, therefore, a nullity.

In its February 13, 2020 Order, the Florida Circuit Court granted Gunter's motion for extension of time to comply with the January 6, 2020 Order, and supplanted its earlier order to return the children to Brazil with one that provided more details. Specifically, the court ordered the children to be returned to Brazil "*subject to the independent determination by the Brazil courts of all issues related to the custody of the [c]hildren*." (Doc. No. 1-9 at 8 (emphasis added).) The court stated that "the purpose of the return of the [c]hildren to Brazil, and to said jurisdiction, is for the parties to obtain a final order regarding the custody of the [c]hildren in a court of competent jurisdiction," and that "this [o]rder is not a determination of the merits of any custody issues." (*Id*.) However, to effectuate that purpose, the court merely ordered Gunter "*to personally accompany the [c]hildren on their return to Brazil at her sole expense <u>and there maintain custody of the [c]hildren pending further orders of the Brazilian Court</u>*." (*Id*. at 9 (emphasis added).)

Gunter appealed and, after resolution of the appeal, in an Order entered January 19, 2021, the Florida Circuit Court noted Gunter had advised the court that she still intended to avail herself of the option to return to Brazil with the children at her own expense. (Doc. No. 1-10 at 15.) Though the court again noted that the "purpose" of the return order was "for the parties to obtain a final order regarding the custody of the [c]hildren in a court of competent jurisdiction" and was not itself a custody determination, the court did not order Gunter to remain in Brazil until all appeals were exhausted. Neither did the court alter its earlier express direction to Gunter to return to Brazil "subject to the independent

determination by the Brazil courts of all issues related to the custody of the [c]hildren" and to "maintain custody of the [c]hildren" in Brazil "pending further orders of the Brazilian Court" – which is exactly what she did. (*Id*. at 14-17; Doc. No. 1-9 at 8-9.)

As Brazil's own courts have consistently held on numerous occasions (Doc. No. 19-2; Doc. No. 20-2 at 11;[54] Doc. No. 29-1; Doc. No. 48-3), Gunter has already complied with the return order of the Florida Circuit Court because, on February 22, 2021, Gunter arrived in Brazil with the children for resolution of the custody issue. (Doc. No. 1 at 8.) The order for Gunter to return to Brazil has been satisfied. When she left Brazil in January 2022, Gunter had received an order from a competent Brazilian court expressly allowing her to immediately depart with the children for the United States.[55] Further, when she left Brazil in January 2022, it was the position of every court in Brazil that had "independently" addressed the issue that Brazil did not have jurisdiction to determine custody and that custody was to be determined in the United States. Accordingly, when Gunter left Brazil in January 2022 with the children, she did not violate the Florida court's orders *or* Pereira's parental rights – including his rights to custody of the children – under Brazil's law at that time. Convention, art. 14 ("In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the

---

[54] The Superior Court of Justice in Brazil declined to ratify the January 13, 2021 return order of the Florida Circuit Court, in part because it found Gunter had already complied with that order. (Doc. No. 20-2 at 11 ("[T]he order determining the return of the children to Brazil is not eligible for ratification, either" because that order "was complied with, as the records clearly indicate…").

[55] In Section VI.B.2.A of this Order and Recommendation, the undersigned discussed the fact that, though Gunter technically violated the supersedeas (of which she was unaware) when she left Brazil, she did not violate Brazilian law or Pereira's right of custody under Brazil's law or the Hague Convention.

requested State may take notice directly of the law of, *and of judicial or administrative decisions*, formally recogni[z]ed or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." (emphasis added)).

To the extent that Pereira argues that Gunter's departure from Brazil in January 2022 may have been somehow inconsistent with the Florida courts' finding that Brazil was the children's place of habitual residence with jurisdiction to determine custody, that argument fails as well. That finding was not itself a custody determination. Therefore, it did not bestow Pereira with custody rights under the laws of either Florida or Brazil that could have been violated by Gunter's return to the United States in January 2022. Again, it is not the violation of the Florida court's orders or findings at issue, but *the violation of Pereira's right to custody under Brazilian law as that law existed on January 12, 2022*, that Pereira must establish in making his *prima facie* case of wrongful removal.

In short, the Florida court's orders do not somehow transmogrify Gunter's subsequent return to the United States in January 2022 into a violation of Pereira's custody rights under Brazilian law in violation of the Hague Convention. Pereira has failed to carry his burden on this issue. *White*, 718 F.3d at 308 (holding that "the determination of whether removal is wrongful is based on rights of custody at the time of removal").

d.      Domestication of the Florida Court's January 6, 2020 Order

Pereira has submitted the June 26, 2023 Order of the Superior Court of Justice, in which that court domesticated the Florida Circuit Court's January 6, 2020 Order. (Doc. No. 20-2.) He argues the domestication order now conclusively establishes that Brazil is the

children's habitual place of residence under the Hague Convention. For purposes of this Order and Recommendation, the undersigned has already presumed (without deciding) that Brazil is the children's habitual place of residence and the proper jurisdiction for purposes of determining custody in accordance with the Hague Convention. Thus, the domestication order has no impact on the outcome in this case.

Further, Pereira has cited no legal authority indicating that legal developments that occur *after* the removal in question (such as Brazil's post-removal domestication of a foreign order that predates the removal) could somehow retroactively entitle him to a finding that the January 12, 2022 removal was itself a violation of his custody rights and the Hague Convention. *Cf. White*, 718 F.3d at 300 (holding that a custody ruling issued two years after removal of the child did not warrant relief under the Hague Convention because "whether removal is wrongful is *based on rights of custody at the time of removal*" (emphasis added)).

Even if Pereira could use the domestication order as grounds to request Brazil's courts to revisit the issue of custody going forward (and this court offers no opinion on that subject),[56] the domestication order still does not retroactively convert Gunter's past relocation to the United States with the children on January 12, 2022 into a violation of

---

[56] The undersigned hopes that, if Pereira attempts to seek further custody determinations in Brazil, or to enforce those custody determinations through the appropriate channels in this country, he will properly and timely notify Gunter of any such action. As is evident from the procedural history recounted in this case, it has been his common practice to obtain orders in Brazil in his favor (most of which have been vacated or revoked) without prior notice or proper service to Gunter. Such a tactic does not lend itself to the inference that Pereira is truly desirous of efficiently resolving the custody issue in the best interests of his children.

Pereira's custody rights in contravention of the Hague Convention. *See Shealy*, 295 F.3d at 1124 ("The Convention is very clear that the law of the country in which the child was habitually resident governs decisions as to whether custody rights existed at the time of removal."). Rather, under the Hague Convention, the court looks to whether the removal violated a then-existing right to custody that was actively being exercised by the nonremoving parent "at the time of removal." *See White*, 718 F.3d at 308 (holding that "the determination of whether removal is wrongful is based on rights of custody at the time of removal"). As the State Supreme Court of Minas Gerais held, the removal of the children in January 2022 violated neither the law nor Pereira's parental rights at the time. (Doc. No. 48-3; *see also* Doc. No. 19-2; Doc. No. 34-4.) In its own June 26, 2023 Order domesticating the January 6, 2020 Order of the Florida Circuit Court, the Superior Court of Justice confirmed that Brazil's lack of jurisdiction to determine custody *had been* the state of the law in Brazil up until the date of the domestication order. (Doc. No. 20-2 at 9 ("[T]he facts now included in these records demonstrate a lack of jurisdiction of both the Foreign Court and the Brazilian Court to decide on the custody of [Pereira's] and [Gunter's] minor children.").)

Pereira argues that, in domesticating the January 6, 2020 Order of the Florida Circuit Court, Brazil's judicial system *now* takes the position that Brazil has jurisdiction to determine custody.[57] Pereira predicts that the domestication decision will result one day in

---

[57] The undersigned makes no finding as to whether the domestication order means that Brazil is currently the children's place of habitual residence or that Brazil's courts will now exercise jurisdiction to determine custody. Those are questions for Brazil's courts. For purposes of this

the "overruling" of prior Brazilian court opinions on the issue of jurisdiction to determine custody. (Doc. No. 20 at 2.)   Yet, *this* court does not have jurisdiction to "repeal" the previous decisions of Brazil's courts as Pereira suggests. (*Id*. at 3.) Even if those decisions are one day "overruled" by a court of competent jurisdiction to do so, the fact remains that, *at the time of removal*, it was *then* the position of Brazil's courts that Brazil *did not* have jurisdiction to determine custody.[58] Therefore, whatever impact the domestication order may have on possible *future* custody determinations, it does not *retroactively* convert Gunter's January 2022 removal of the children from Brazil into one that violated Pereira's then-existing, then-exercised custody rights.

Finally, to the extent Pereira feels that Gunter is in violation of a domesticated order from a Florida court to return the children to Brazil, his argument fails for several reasons. First, it is important to note that Brazil's Superior Court of Justice expressly did not domesticate the Florida Circuit Court's January 13, 2021 order to physically return the children to Brazil because that order had already been satisfied by Gunter when she

---

analysis, the undersigned merely assumes, without deciding, that the domestication order changes Brazil's position on those issues.

[58] Even Pereira characterizes the domestication order as a "**significant** turn in the substantive position of the Brazilian courts that Brazil will not address the children's custody or that the children are permissibly in the United States." (Doc. No. 24 at 2 (bold emphasis in original; citation and internal quotation marks omitted.) The domestication order states no opinion as to the legality of the children's *current* residence in the United States as a result of their removal from Brazil in 2022 (because the Florida order it domesticates does not address that issue) The domestication order may harbinge or represent a "significant turn" in Brazil's forward-looking position regarding its own jurisdiction to determine custody and in its position on whether Gunter's retention of the children in Florida in 2016 violated the Hague Convention. In other words, as Pereira recognizes, even if the domestication order effectively reverses Brazil's position on these two issues, the new position of the Brazilian justice system on these issues is a "significant turn" from its position at the time Gunter left Brazil in January 2022.

returned to Brazil with the children in 2021. (Doc. No. 20-2 (June 26, 2023 Order of the Superior Court of Justice) (holding that, unlike the January 6, 2020 Order of the Florida Circuit Court,[59] "the [January 13, 2021] order determining the return of the children to Brazil is not eligible for ratification" or domestication because, among other reasons, the order "determining the criteria for the return of the couple's children from the United States of America to Brazil was complied with, as the records clearly indicate" that Gunter did return the children to Brazil in accordance with that order); *see* Doc. No. 29-1 at 12-14 (October 9, 2023 Order of the 3rd Federal Civil and Criminal Court of the SSJ of Juiz de Fora revoking its previous order of return on grounds that Gunter already complied with it when she returned to Brazil in 2021, and did not violate it when she returned to the United States in January 2022; further, noting that "[Pereira] himself acknowledges in his initial pleading that the judgment has already been complied with by [Gunter]".)

In short, the Order of the Superior Court of Justice domesticating the Florida Circuit Court's January 6, 2020 Order does not operate as a time machine to retroactively change

---

[59] By Order entered February 13, 2020, the Florida Circuit Court "cancel[led] and supersed[ed]" the portion of the January 6, 2020 Order directing Gunter to turn the children over to Pereira to return them to Brazil. (Doc. No. 1-9 at 8-9 ¶¶ 4, 6.) The court later entered orders on February 13, 2020 and on January 13, 2021 specifying how the return was to be made and ordering the return. (Doc. No. 1-9; Doc. No. 1-10 at 14-17.) Notably, the February 13, 2020 Order required the children's return to Brazil "subject to the independent determination by the Brazil courts of all issues related to the custody of the children," and directed Gunter to remain there "pending further orders of the Brazilian court," which she did. (Doc. No. 1-9 at 8-9 ¶¶ 4. 6-7.)  When she left Brazil with the children, Gunter had received a court order expressly allowing her to leave Brazil, and she subsequently obtained two State Supreme Court Orders confirming that, at the time she left Brazil, she violated neither the law, nor the Hague Convention, nor Pereira's parental rights. (Doc. No. 48-3; Doc. No. 19-2; *see also* Doc. No. 29-1 at 10-14 (October 9, 2023 decision of the 3rd Federal Civil and Criminal Court).) Further, as explained above in Section IV.B.2.a., the supersedeas entered the day before Gunter left did not cause her removal of the children on January 12, 2022, to violate Pereira's parental rights.

the state of the law in Brazil as it had been at the time Gunter left with the children in January 2022. Brazil's courts have made clear their position that the removal of the children in January 2022 *did not* violate the Hague Convention or Pereira's parental rights under Brazil's laws at that time. Further, at the time of removal, they also took the position that Brazil had no authority to determine custody, as the United States was the children's place of habitual residence and Pereira was the one that unilaterally left the family. Therefore, at the time Gunter left Brazil with the children in January 2022, she did not violate Pereira's custody rights as determined by Brazil's own courts. Pereira has cited absolutely no authority of any kind that would support a holding to the contrary. In particular, he has submitted no authority that the June 2023 domestication order should retroactively apply to the assessment of whether Gunter's removal of the children violated Pereira's custody rights in January 2022. *Cf. White*, 718 F.3d at 300 (holding that, where the court in the country of the child's habitual residence altered its custody ruling two years after removal of the child, the order did not provide grounds for an order of return under the Hague Convention because "the determination of whether removal is wrongful is based on rights of custody at the time of removal").

Accordingly, Pereira has failed to demonstrate that Brazil's June 26, 2023 domestication of the Florida Circuit Court's January 6, 2020 Order establishes that Gunter wrongfully removed the children from Brazil on January 12, 2022.

      e.      The September 5, 2023 Order of Return From the 3rd Federal Civil and Criminal Court of the SSJ of Juiz de Fora

On September 5, 2023, Pereira secured an order of return from the 3rd Federal Civil and Criminal Court of the SSJ of Juiz de Fora. (Doc. No. 21-2) In that order, the court ordered Gunter to comply with the January 6, 2020 Florida Circuit Court order. (*Id*. at 5.) Further, the 3rd Federal Civil and Criminal Court authorized the search, seizure, and return of the children if Gunter did not comply with the Florida Circuit Court order by a date certain. (*Id*. at 5-6.)

Pereira suggests that the September 5, 2023 Order of the 3rd Federal and Criminal Court obligates this court to issue a return order. That argument fails spectacularly, as the September 5, 2023 Order has since been revoked.[60] Once Gunter learned of the return order and appeared to answer it, the 3rd Federal Civil and Criminal Court revoked the return order on grounds that Gunter had demonstrated that she had already complied with the Florida court's order, and her return to the United States in 2022 "represents a new fact, not covered by the judgment that [Pereira] intends to enforce in this case." (Doc. No. 29-1 at 10-14.) Pereira has appealed the revocation of the order of return. (Doc. No. 34-4 at 13.)

As of this date, the order of return has been revoked and has not been reinstated on appeal. Even if it were reinstated, though it authorized law enforcement to effectuate the return of the children, Pereira has cited no legal authority regarding its impact, if any, on this court's analysis of his Petition and specifically whether, on January 12, 2022, Gunter violated the Hague Convention by returning with the children to this country.

---

[60] Pereira appears to attack the merits of the order that, in turn, revoked the return order of the 3rd Federal Civil and Criminal Court. There is no reason for this court to assess the merits of the revocation of that order. As Pereira has pointed out, it is on appeal.

Accordingly, Pereira has not demonstrated by a preponderance of the evidence that the order of return entitles him to a ruling from this court that Gunter's January 12, 2022 removal of the children was in breach of his custody rights under Brazilian law at that time. *Berenguela-Alvarado*, 950 F.3d t 1358. Therefore, the September 5, 2023 Order of Return does not entitle him to prevail on his petition.

C.      Summary Judgment Motion and Motion to Dismiss (Doc. No. 11)

The relevant, material facts regarding Gunter's return from Brazil with the children on January 12, 2022 are undisputed. That is, it is undisputed that she left Brazil with the children on January 12, 2022, and the state of the law in Brazil with respect to whether she violated Pereira's custody rights by doing so is established by the uncontradicted exhibits submitted by the parties. As indicated throughout Section VI.B. of this Order and Recommendation, Gunter has demonstrated that, as a matter of law, the removal of the children on January 12, 2022 did not violate Pereira's custody rights under Brazilian law or Pereira's parental rights on the date of removal. Brazil's courts have consistently made clear that Gunter had full authority to leave Brazil with the children on January 12, 2022, and that she did not violate Pereira's parental rights by doing so.

Pereira has failed to come forward with substantial evidence to the contrary. As explained above, he has failed to demonstrate that the wrongfulness of the removal is established by the orders of the Florida District court requiring Gunter to return to Brazil, the February 19, 2021 Preliminary Order of the Juvenile Court of the Judicial District of Juiz de Fora, the January 11, 2022 supersedeas, the June 26, 2023 Order of the Superior Court of Justice adopting the Florida Circuit Court's January 6, 2020 Order, or the

September 5, 2023 Order of Removal. Pereira has also failed to come forward with any legal authority establishing that the court should not look to the law of Brazil as it stood at the time of removal, but should be determined by the law or court opinions that were operable at some other point in time. Nor has he come forward with legal authority that would require a ruling in his favor for some other reason. *Celotex*, 477 U.S. at 324 (holding that, once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'").

Accordingly, Gunter is entitled to judgment as a matter of law that the removal of the children on January 12, 2022 was not "wrongful" within the meaning of the Hague Convention. Her motion for summary judgment (Doc. No. 11) is due to be granted. Fed. R. Civ. P. 56(e).

The motion to dismiss (Doc. No. 11) is due to be denied as moot.

## VII.   CONCLUSION

Accordingly, it is ORDERED as follows:

1.      Pereira's Motion to Serve Supplemental Pleadings to Set Out the Occurrence of Domestication in the Federative Republic of Brazil of Judgments from the State of Florida that Ordered the Return of Wrongfully Retained Children (Doc. No. 20) is GRANTED.

2.    Pereira's Motion to Serve Supplemental Pleadings to Set Out the Pronouncement by the Brazilian Federal court of Juiz de Fora of a Return order of Wrongfully Removed Children (Doc. No. 24) is GRANTED.

3.    The Clerk of the Court shall serve Plaintiff with a copy of this Order and Recommendation in accordance with the usual procedures. In addition, in light of upcoming deadlines, on this occasion,[61] the Clerk of the Court shall email Plaintiff a copy of this Order and Recommendation. Plaintiff is ADVISED that he is **not permitted to reply** to the Clerk's email with an email or to otherwise attempt inappropriately to communicate with the Office of the Clerk of the Court by email. **If Plaintiff attempts to communicate with the Office of the Clerk of the Court in a manner that violates this or previous orders, the Clerk of the Court shall immediately notify the undersigned of the infraction. Upon Plaintiff's receipt** from the Clerk of the email containing a copy of this Order, Plaintiff shall **immediately <u>file</u>, in writing, notice of receipt of the same. <u>Again, filings by email are not accepted.</u>**

4.    **<u>Pereira shall not attempt to communicate *ex parte* with the court in any manner, including via phone calls, emails, or other communications</u>**

---

[61] Future orders shall **not** be served by email, unless otherwise specifically ordered.

**from third parties acting at his instigation. The court does not accept *ex parte* communications from anyone.**

Further, it is the RECOMMENDATION OF THE MAGISTRATE JUDGE that

1.    Plaintiff Leonardo de Carvalho Pereira's Verified Petition to Domesticate a Foreign Florida Judgment and To Order the Return of Abducted and Wrongfully Retained Children Pursuant to International Treaty and Federal Statute (Doc. No. 1) be DENIED.

2.    Defendant Niva Costa Cruz Gunter's Motion to Dismiss (Doc. No. 11) be DENIED as MOOT.

3.    Defendant Niva Costa Cruz Gunter's Motion for Summary Judgment (Doc. No. 11) be GRANTED.

Further, it is ORDERED that the parties shall file any objections to this Recommendation on or before **March 7, 2024**.[62]   A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made;

---

[62] At the December 4, 2023 hearing, Pereira represented to the court that it took at least thirty days for him to receive orders by mail from this court. Pereira is not credible. In any event, he has consistently been able to receive service of orders and other matters by email, and this Order and Recommendation provides that it be served in that manner.  It is clear from several of his filings that it does not take 30 days for Pereira to deliver motions and other documents *to* this court for filing. (*See, e.g.*, Doc. No. 20 (Pereira's July 10, 2023 Motion to Serve Supplemental Pleadings, to which he attached a June 26, 2023 Brazilian court order that he could have received no earlier than July 6, 2023, the date on which the translator certified it as having been translated into English); Doc. No. 24 (Pereira's September 12, 2023 Motion to Serve Supplemental pleadings to which he attached a September 5, 2023 Brazilian court order that he could have received no earlier than September 6, 2023, the date on which the translator certified it as having been translated into English). Further, the undersigned is confident that there will be no delays due to translation processes or language barriers, as it holds Pereira to his representations to this court that his filings are all *pro se* filings and not those of an attorney. Those filings clearly evince a sophisticated capacity to comprehend and communicate in the English language as it is used in the legal setting.

frivolous, conclusive, or general objections will not be considered. Plaintiff is advised that this Recommendation is not a final order of the Court; therefore, it is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1; *see Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 22nd day of February, 2024.

_____
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE